**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| HERA WIRELESS S.A. and SISVEL UK LIMITED,<br><br>Plaintiffs,<br><br>v.<br><br>ARRIS GROUP, INC.,<br><br>Defendant. | **Civil Action No. 17-948-RGA**<br><br>**JURY TRIAL DEMANDED** |
| HERA WIRELESS S.A. and SISVEL UK LIMITED,<br><br>Plaintiffs,<br><br>v.<br><br>BELKIN INTERNATIONAL, INC.,<br><br>Defendant. | **Civil Action No. 17-949-RGA**<br><br>**JURY TRIAL DEMANDED** |
| HERA WIRELESS S.A. and SISVEL UK LIMITED,<br><br>Plaintiffs,<br><br>v.<br><br>NETGEAR, INC.,<br><br>Defendant. | **Civil Action No. 17-951-RGA**<br><br>**JURY TRIAL DEMANDED** |
| HERA WIRELESS S.A. and SISVEL UK LIMITED,<br><br>Plaintiffs,<br><br>v.<br><br>ROKU, INC.,<br><br>Defendant. | **Civil Action No. 17-952-RGA**<br><br>**JURY TRIAL DEMANDED** |

| | |
|---|---|
| HERA WIRELESS S.A. and SISVEL UK LIMITED,<br><br>Plaintiffs,<br><br>v.<br><br>LENOVO HOLDING COMPANY, INC.; and LENOVO (UNITED STATES), INC.,<br><br>Defendants. | **Civil Action No. 17-1088-RGA**<br><br>**JURY TRIAL DEMANDED** |

## JOINT CLAIM CONSTRUCTION BRIEF

Pursuant to Paragraph 9 of the Court's Scheduling Order, Plaintiffs Hera Wireless S.A. and Sisvel UK Limited ("Sisvel"), and Defendant ARRIS Group, Inc., Defendant Belkin International, Inc., Defendant Netgear, Inc., Defendant Roku, Inc., Defendants Lenovo Holding Company, Inc. and Lenovo (United States), Inc. (collectively "Defendants") jointly submit the attached joint claim construction brief.

Unless otherwise noted, all references to "JA Ex. ___" refer to the corresponding exhibit in the parties' Joint Claim Construction Appendix, filed concurrently herewith.

## TABLE OF CONTENTS

I. AGREED UPON CONSTRUCTIONS ..... 1

II. DEFENDANTS' INTRODUCTION ..... 1

III. LEVEL OF ORDINARY SKILL IN THE ART ..... 2

1. Sisvel's Position ..... 2

2. Defendants' Position ..... 2

IV. DISPUTED CONSTRUCTIONS ..... 3

1. Defendants' Summary of U.S. Patent Nos. 7,962,103, 8,412,115, 8,934,851, and 9,270,024 ..... 3

2. "spatial paths" / "spatial signals" / "number of spatial paths formable" / "number of spatial paths that can be formed" / "number of spatial signals" – Claims 1 and 4 of the '103 patent; Claims 1 and 4 of the '115 patent; Claims 1, 4, and 7 of the '851 patent; and claims 1 and 12 of the '024 patent ..... 4

a. Sisvel's Opening Position ..... 5

b. Defendants' Answering Position ..... 9

c. Sisvel's Reply Position ..... 13

d. Defendants' Sur-Reply Position ..... 16

3. "adaptive array unit capable of performing adaptive array processing on signals corresponding to a plurality of antennas"; "adaptive array unit" / "signal processing unit" / "adaptive array processing" / "signal processing unit capable of processing spatial signals to be transmitted through the plurality of transmission units and the plurality of antennas" – Claims 1 and 4 of the '103 patent; Claims 1 and 12 of the '024 patent ..... 20

a. Sisvel's Opening Position ..... 21

b. Defendants' Answering Position ..... 23

c. Sisvel's Reply Position ..... 27

d. Defendants' Sur-Reply Position ..... 28

4. "a value indicating possible multiplicity" / "a value indicating possible multiplicity associated with the [number of spatial paths formable]" – Claims 1 and 4 of the '103 Patent; Claims 1 and 4 of the '115 Patent; Claims 1, 4 and 7 of the '851 Patent; "information on the number of spatial signals that can be processed by the signal processing unit" – Claims 1 and 12 of the '024 Patent ..... 29

a. Sisvel's Opening Position ..... 29

b. Defendants' Answering Position ..... 32

c. Sisvel's Reply Position ..... 37

d. Defendants' Sur-Reply Position ..... 40

5. "a predetermined timing"/ "predetermined timing" – Claims 1 and 4 of the '103 Patent; Claims 1 and 4 of the '115 Patent; Claims 1, 4 and 7 of the '851 Patent ..... 42

**a. Sisvel's Opening Position** .......... 42

**b. Defendants' Answering Position** .......... 44

**c. Sisvel's Reply Position** .......... 48

**d. Defendants' Sur-Reply Position** .......... 49

**6. Defendants' Summary of U.S. Patent Nos. 7,369,878, 7,454,234, and 7,873,389** .......... 50

**7. "radio base station apparatus" – Claim 1 of the '878 Patent; Claim 1 of the '234 Patent** .......... 51

**a. Sisvel's Opening Position** .......... 51

**b. Defendants' Answering Position** .......... 53

**c. Sisvel's Reply Position** .......... 56

**d. Defendants' Sur-Reply Position** .......... 58

**8. "reception operation [adapted to a transmission operation]" – Claim 1 of the '878 Patent; Claim 1 of the '234 Patent; and Claim 1 of the '389 Patent** .......... 59

**a. Sisvel's Opening Position** .......... 60

**b. Defendants' Answering Position** .......... 61

**c. Sisvel's Reply Position** .......... 63

**d. Defendants' Sur-Reply Position** .......... 65

**9. Defendants' Summary of U.S. Patent No. 8,737,377** .......... 67

**10. "generation unit"/ "generation unit [configured to generate / generates] a packet signal. . ."; ('377 patent, Claims 1 to 4)** .......... 67

**a. Sisvel's Opening Position** .......... 68

**b. Defendants' Answering Position** .......... 72

**c. Sisvel's Reply Position** .......... 76

**d. Defendants' Sur-Reply Position** .......... 78

**11. "threshold value defined for time" / "a/said predetermined time amount" – Claims 1 to 4 of the '377 Patent** .......... 80

**a. Sisvel's Opening Position** .......... 80

**b. Defendants' Answering Position** .......... 82

**c. Sisvel's Reply Position** .......... 84

**d. Defendants' Sur-Reply Position** .......... 85

**V. U.S. PATENT NO. 8,295,400** .......... 86

**1. "the signal transmitted from a given [one] antenna"/ "the signal transmitted from another antenna"; ('400 patent, Claims 1 and 2)** .......... 86


## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Accent Packaging, Inc. v. Leggett & Platt, Inc.*,
707 F. 3d 1318 (Fed. Cir. 2013) .......... 23

*AK Steel Corp. v. Sollac*,
344 F.3d 1234 (Fed. Cir. 2003) .......... 15

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
314 F.3d 1313 (Fed. Cir. 2003) ..........7, 53, 58

*Aristocrat Techs. Australia PTY Ltd. v. Int'l Game Tech.*,
521 F.3d 1328 (Fed. Cir. 2008) ..........69 ,73 ,79

*Bd. of Regents of the Univ. of Tex. Sys. v. BENQ Am. Corp.*,
533 F.3d 1362 (Fed. Cir. 2008) .......... 35

*Comput. Docking Station Corp. v. Dell, Inc.*,
519 F.3d 1366 (Fed. Cir. 2008) .......... 37

*C.R. Bard, Inc. v. U.S. Surgical Corp.*,
388 F.3d 858 (Fed. Cir. 2004) .......... 64

*EPOS Technologies Ltd. v. Pegasus Technologies Ltd.*,
766 F.3d 1338 (Fed. Cir. 2014) ..........8, 31, 44, 53, 61, 70

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
535 U.S. 722 (2002) .......... 36

*Globetrotter Software, Inc. v. Elan Computer Group, Inc.*,
362 F.3d 1367 (Fed. Cir. 2004) .......... 23

*GPNE Corp. v. Apple Inc.*,
830 F.3d 1365 (Fed. Cir. 2016) .......... 12

*Graham v. John Deere Co.*,
383 U.S. 1 (1966) .......... 37

*Hoganas AB v. Dresser Industries, Inc.*,
9 F.3d 948 (Fed. Cir. 1993) ..........7, 53, 58, 82

*ICU Med., Inc. v. Alaris Med. Sys., Inc.*,
558 F.3d 1368 (Fed. Cir. 2009) .......... 63

*In re Katz Interactive Call Processing Patent Litigation*,
639 F.3d 1303 (Fed. Cir. 2011) ..........8, 31, 44, 53, 61

*Int'l Rectifier Corp. v. IXYS Corp.*,
361 F.3d 1363 (Fed. Cir. 2004) .......... 23

*Invitrogen Corp. v. Clontech Laboratories, Inc.*,
429 F.3d 1052, 1076 (Fed. Cir. 2005) .......... 56

*Mass. Inst. of Tech. v. Shire Pharms., Inc.*,
839 F.3d 1111 (Fed. Cir. 2016) .......... 16

*MBO Labs., Inc. v. Becton, Dickinson & Co.*,
474 F.3d 1323 (Fed. Cir. 2007) .......... 36

*Medicines Co. v. Mylan Inc.*,
No. 11-cv-1285,
2012 WL 3234282 (N.D. Ill. Aug. 6, 2012) .......... 36

*Medical Instrumentation & Diagnostics Corp. v. Elekta AB*,
344 F.3d 1205 (Fed. Cir. 2003) .......... 79

*Merck & Co. v. Teva Pharms. USA, Inc.*,
395 F.3d 1364 (Fed. Cir. 2005) .......... 81, 84

*Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*,
75 F.3d 1545 (Fed. Cir. 1996) .......... 23

*Noah Sys., Inc. v. Intuit Inc.*,
675 F.3d 1302 (Fed. Cir. 2012) .......... 79

*Nystrom v. Trex Co.*,
424 F.3d 1136 (Fed. Cir. 2005) .......... 23

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008) .......... 83, 85

*On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH*,
386 F.3d 1133 (Fed. Cir. 2004) .......... 23

*Omega Eng'g, Inc. v. Raytek Corp.*,
334 F.3d 1314 (Fed. Cir. 2003) .......... 31, 38

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) .......... 7, 14, 16, 27, 41, 60, 85

*Power Mosfet Techs., L.L.C. v. Siemens AG*,
378 F.3d 1396 (Fed. Cir. 2004) .......... 81, 82, 84

*Retractable Techs., Inc. v. Becton, Dickinson & Co.*,
653 F.3d 1296 (Fed. Cir. 2011) ........................................................................ 25

*RFID Tracker, Ltd. v. Wal-Mart Stores, Inc.*,
342 F. App'x 628 (Fed. Cir. 2009) .................................................................... 36

*Ruckus Wireless, Inc. v. Innovative Wireless Sols.*, LLC,
824 F.3d 999 (Fed. Cir. 2016) .......................................................................... 63

*Spectrum Int'l, Inc. v. Sterilite Corp*,
164 F.3d 1372 (Fed. Cir. 1998) ........................................................................ 36

*St. Clair Intellectual Prop. Consultants v. Matsushita Elec. Indus. Co.*,
691 F. Supp. 2d 538 (D. Del. 2009) .................................................................. 16

*Triplay, Inc. v. Whatsapp, Inc.*,
No. 13-1703-LPS-CJB,
2016 U.S. Dist. LEXIS 157680 (D. Del. Nov. 15, 2016) ...............................................71, 77

*Trivascular, Inc. v. Samuels*,
812 F.3d 1056 (Fed. Cir. 2016) ........................................................................ 36

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
503 F.3d 1295 (Fed. Cir. 2007) ........................................................................ 12

*Virnetx, Inc. v. Cisco Sys., Inc.*,
767 F.3d 1308 (Fed. Cir. 2014) ........................................................................ 25

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996) .......................................................................... 23

*Vita-Mix Corp. v. Basic Holding, Inc.*,
581 F.3d 1317 (Fed. Cir. 2009) ........................................................................ 84

*Williamson v. Citrix Online, LLC*,
792 F.3d 1339 (Fed. Cir. 2015) ........................................................................ 70

**Statutes**

35 U.S.C. § 112 ..........................................................................................67, 68, 72, 78, 79

## I. AGREED UPON CONSTRUCTIONS

| No. | Patent term | Agreed Construction |
|---|---|---|
| 1 | "indicative of non-execution" (Claim 3 of the '377 patent) | instruction prohibiting execution |
| 2 | "information permitting" (Claim 1 of the '377 patent) | instruction permitting |
| 3 | "information indicative of execution" (Claim 3 of the '377 patent) | instruction indicative of execution |
| 4 | "information . . . indicative of permission" (Claim 3 of the '377 patent) | instruction configured to permit |
| 5 | "packet signal" (Claims 1 and 3 of the '377 patent) | one or more streams of packets |

## II. DEFENDANTS' INTRODUCTION[1]

In attempting to navigate the crowded prior art in the field of wireless communications, Sanyo (the original assignee of many of the asserted patents) and Plaintiffs Hera Wireless S.A. and Sisvel UK Limited ("Plaintiffs") drafted narrow claims tied to specific embodiments described in the specifications to secure issuance of the asserted patents. Sanyo and Plaintiffs also argued distinctions between the claimed subject matter and the cited prior art to the Patent Office to secure allowance of the patents. Defendants propose constructions that fairly hold Plaintiffs to the language of the issued claims as informed by the specifications and the statements made during prosecution.

Plaintiffs, on the other hand, propose broad claim constructions that stray from the intrinsic record for the purpose of reading the claims on the IEEE 802.11n Wi-Fi standard. First, Plaintiffs frequently skip over the starting point of any claim construction analysis—the language

[1] Plaintiffs object to the inclusion of this section as it is not contemplated by Paragraph 9 of this Court's Scheduling Order.

of the claims. Many of Plaintiffs' constructions are incompatible with the claim language. Second, Plaintiffs err by relying on selected excerpts from the patent specifications while overlooking other critical teachings. For the excerpts they cite, Plaintiffs often misinterpret the specifications. In some instances, the cited excerpts are not even relevant to the points Plaintiffs advance. Third, Plaintiffs' constructions fail to account for statements to the Patent Office during the original prosecution limiting the scope of some claim terms. The public, including Defendants, have a right to rely on those statements, and Plaintiffs should not be permitted to reclaim claim scope that was conceded during prosecution. For these reasons, as further described below, the Court should adopt Defendants' constructions.

Like its Opening Brief, Plaintiffs' Reply Brief ignores intrinsic record context that undermines Plaintiffs' constructions and supports Defendants'. Plaintiffs also misinterpret the intrinsic record and Defendants' constructions and compound those missteps by relying on artificial legal standards and irrelevant case law. Defendants' constructions should prevail because they reflect the intrinsic evidence as it is, rather than as distorted by Plaintiffs.

## III. LEVEL OF ORDINARY SKILL IN THE ART

### 1. Sisvel's Position

For the asserted patents, a person of ordinary skill in the art ("POSITA") would have at least a Bachelor's Degree in electrical engineering or a related discipline and 3 to 5 years' experience in wireless communications.

### 2. Defendants' Position

A skilled person would have a Master's degree in electrical engineering and at least 2-4 years of academic or industry experience in designing and implementing digital wireless communication systems. In addition, for the '400 and '377 patents, a skilled person would be familiar with the IEEE 802.11 standards. Plaintiffs propose a different level of skill. Joint Br. at

2. Defendants' constructions and related arguments tied to the intrinsic record would be the same under either proposed level of skill.

## IV. DISPUTED CONSTRUCTIONS

### 1. Defendants' Summary of U.S. Patent Nos. 7,962,103, 8,412,115, 8,934,851, and 9,270,024[2]

The '103, '115, '851, and '024 patents relate to an alleged enhancement of a Path Division Multiple Access (PDMA) scheme in the prior art Personal Handyphone System (PHS). JA Ex. A, 2:18-25, 3:24-28.[3] The specification first describes PHS as using Time Division Multiple Access (TDMA) to divide a single-frequency wireless communication channel into time slots that are allocated for specific users, as illustrated in Figure 20B. *Id.*, 2:57-64. The specification then describes PHS's use of PDMA to further subdivide a channel in space, so that multiple users can communicate with a base station using "a plurality of paths formed by spatially subdividing an identical time slot of an identical frequency." *Id.*, 2:19-25. Subdividing a transmission channel in space resulted in more efficient usage of radio spectrum. *Id.*

The specification also describes a known implementation of PDMA that uses multiple antennas to form multiple spatial paths in the channel between two radio devices (*e.g.*, a base station and a laptop), as shown in Figure 21. According to the specification, that implementation was unable to handle communication failures making it

FIG.21
Prior Art




[2] Plaintiffs object to the inclusion of this section as it is not contemplated by Paragraph 9 of this Court's Scheduling Order.

[3] The '103, '115, '851, and '024 patents share a nearly identical specification. Defendants cite to the specification of the '103 patent, but the cited material also appears in the other patents.

"difficult in some cases to achieve a stable communication speed." *Id.*, 4:10-22. The patents' objective is to "provide a radio apparatus capable of adaptive modification in connection of a plurality of paths between a terminal and a base station in accordance with a communication condition in a mobile communication," as well as "a method and a program for controlling a spatial path." *Id.*, 4:23-30. In other words, the number of formable paths between the two radio devices depends on several factors, including how many antennas a radio device has and communication conditions in the channel. *Id.*, 9:9-14, 10:13-17. At a "prescribed timing," the terminal (*e.g.*, laptop) sends the base station a value relating to the number of formable spatial paths, such as the number of terminal antennas, the number of antennas that are functioning normally, or data about current channel communication quality (*e.g.*, frame error rates, amounts of interference). *Id.*, 4:48-5:2, 9:40-49, 10:54-58, 11:32-36, 11:57-62. A radio device uses this information to determine the number of spatial paths formable in the communications channel.

**2. "spatial paths" / "spatial signals" / "number of spatial paths formable" / "number of spatial paths that can be formed" / "number of spatial signals" – Claims 1 and 4 of the '103 patent; Claims 1 and 4 of the '115 patent; Claims 1, 4, and 7 of the '851 patent; and claims 1 and 12 of the '024 patent**

| **Term** | **Plaintiffs' proposed construction** | **Defendants' proposed construction** |
|---|---|---|
| "spatial paths" / "spatial signals" | one or more routes through which a signal can travel over a communications link between the antennas of one radio apparatus and the antennas of a second radio apparatus | one or more spatially distinct sub-channels |
| "number of spatial paths formable" / "number of spatial paths that can be formed" / "number of spatial signals" | the number of spatial paths that the radio apparatus is capable of establishing with a second radio apparatus | number of spatially distinct sub-channels that may be established based on communication status |

**a. Sisvel's Opening Position**

At the time of the invention, the terms "spatial paths" and "spatial signals" were well-understood terms of art. The intrinsic record does nothing to limit the general definition understood by a POSITA. On the contrary, Plaintiffs' construction is fully consistent with the intrinsic evidence and encompasses the scope of the terms as they are used throughout the specification.

As taught in the specification of each patent, the inventions claimed in the '103, '115, '851, and '024 patents relate to "a radio apparatus capable of establishing multiplex communication between one radio terminal and a radio base station via a plurality of paths formed by space division." (JA Ex. A at 1:20-23.)[4] In other words, the claimed radio apparatus is capable of communicating with a remote radio apparatus via a "multiple-paths-for-one-user scheme." (*Id*. at 4:23-30.) Figure 2, reproduced below, provides an example of such a multiple input, multiple output ("MIMO") communication scheme and illustrates the "spatial paths" formed between two MIMO radio devices:

[4] Because the '103, '115, '851, and '024 patents share a common specification, all specification citations for these patents are to the '103 patent specification (JA Ex. A), in column:line format. Plaintiffs incorporate by reference the corresponding disclosures of the '115, '851, and '024 patent specifications.

FIG.2




Throughout the specification, the "spatial paths" between a MIMO radio base station apparatus (e.g., "CS1" above) and a MIMO radio terminal apparatus (e.g., laptop 1000 above) are determined as a function of (1) the number of antennas available for transmission and reception, (2) whether those antennas are operating independently or as part of a "subarray," (3) the maximum number of antennas capable of normal operation, or some combination of these factors. (*See, e.g., id.* at 9:41-45; 10:59-62; 13:11-13.)

In Figure 2 above, for example, laptop 1000 has four antennas, #1 to #4, which "form[] one path to base station CS1 with directivity by means of antennas #1 and #3, and form[] another path to base station CS1 with transmission/reception directivity by means of antennas #2 and #4." (*Id.* at 9:30-34.) Antennas #1 and #3 operate together as a single unit called a "subarray," and this subarray acts as a unique endpoint for one spatial path between the laptop and the remote radio base station, CS1. (*Id.* at 9:41-45.) Antennas #2 and #4 of the laptop similarly operate as a single subarray in Figure 2 and form a unique spatial path endpoint. (*Id.*)

In Figure 21, individual antennas 12a and 12b of laptop PS1 each act as unique endpoints for spatial paths between the remote base station CS1 and the laptop:

FIG.21
Prior Art




Consistent with this intrinsic evidence, which is representative of the relevant disclosures in the specification, the term "spatial paths" should be construed as the multiple routes through which a signal can travel over a communications link between the antennas of one radio apparatus and the antennas of a second radio apparatus. Nothing in the prosecution history alters this construction.

Defendants' proposed construction—"one or more spatially distinct sub-channels"—hinges on an ambiguous term, "sub-channels," which does not appear anywhere in the intrinsic evidence. Because intrinsic evidence is "the single best guide to the meaning of a disputed term" and claims must be "read in view of the specification, of which they are a part," *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc), Defendants' construction should be rejected as lacking support in the specification.

Defendants' addition of the ambiguous and extraneous term "sub-channels" is also improper because it obscures rather than clarifies the construction at issue. *See Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1325 (Fed. Cir. 2003) (citing *Hoganas AB v. Dresser Industries, Inc.*, 9 F.3d 948, 950 (Fed. Cir. 1993) ("It is improper for a court to add

extraneous limitations to a claim, that is, limitations added wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim."). Defendants' construction can therefore be rejected for this reason also.

Plaintiffs' construction should instead be adopted.

As with the term "spatial paths," the specification most clearly informs the dispute regarding the related phrase "number of spatial paths formable." Specifically, the specification teaches that (1) a terminal may transmit the number of its antenna elements as the number of spatial paths it is capable of forming (*see*, *e.g.*, Fig. 11); or (2) a base station may determine and transmit the number of spatial paths to be established with a remote terminal based on (a) the number of antennas capable of normal operation, or (b) the communication quality of each path. (*Id.* at 10:13-17; 10:59-64.)

Plaintiffs' construction accounts for each of these three scenarios (1), (2)(a), and (2)(b). It thus appropriately accounts for the intrinsic record. Nothing in the prosecution history alters this construction.

In contrast, Defendants' construction only accounts for scenario (2)(b), in which the base station may adaptively modify the number of paths in use based on communication status. (*Id.* at Fig. 7; 12:47-50.) Defendants' construction would therefore exclude multiple embodiments of the specification, namely (1) and (2)(a) above, and constructions that exclude such disclosed embodiments are "rarely, if ever correct." *See EPOS Technologies Ltd. v. Pegasus Technologies Ltd.*, 766 F.3d 1338, 1347 (Fed. Cir. 2014); *see also In re Katz Interactive Call Processing Patent Litigation*, 639 F.3d 1303, 1324 (Fed. Cir. 2011) ("there is a strong presumption against a claim construction that excludes a disclosed embodiment").

Defendants' construction should therefore be rejected, and Plaintiffs' construction adopted.

**b. Defendants' Answering Position**

Defendants contend that the phrases "spatial paths" and "spatial signals" should be construed as part of the broader phrases (*e.g.*, "number of spatial paths formable," etc.). Defendants' contention is supported by the fact that both parties' constructions of the shorter phrases can be inserted into the broader phrases.

Defendants' constructions correctly capture the claimed requirements and the specification's teachings of (1) spatial division of a communications channel into multiple spatially-distinct paths, *i.e.*, path division, and (2) determining the number of such paths that can be formed based on the status of the communications channel and device hardware.

First, as to the phrase "spatial [paths/signals]," the specification admits that path division, such as in PDMA, was a well-known concept. According to the specification, the prior art teaches a method of spatially dividing a communications channel into a plurality of "paths." JA Ex. A, 2:15-25, 3:37-42. Dividing a communication channel into different "paths" results in multiple sub-channels. These are "spatial paths" and "spatial signals" within the communication channel.[5] Each path is spatially-distinct, as illustrated in Figure 21 above, where communication between base station CS1 and terminal PS1 was divided into two paths, PTH1 and PTH2. *Id.*, 3:37-42. Further, the specification notes that some users may communicate with a base station using multiple paths, but other users may communicate with the same base station using only one

[5] None of the parties contends that the terms "spatial path" and "spatial signal" have different meanings.

path. *Id.*, 4:1-6. Defendants' construction of the phrase "spatial [paths/signals]" includes "one or more spatially distinct sub-channels" and correctly captures these teachings.

Plaintiffs' construction of "spatial [paths/signals]," on the other hand, is incorrect because "multiple routes" is ambiguous and does not reflect the concept of spatial division. "Multiple routes" is conceivably broader than the specification's teaching of spatially dividing the communications channel. It arguably encompasses the concept of multi-path, which is when multiple copies of a wireless transmission are reflected by objects in the communication path, resulting in the signals taking different paths from the transmitter to the receiver. JA Ex. U (definition of "multipath transmission"). As noted above, that is not how the specification describes "spatial paths." While Plaintiffs argue that the specification never uses the term "sub-channel" (Joint Br. at 7), the specification also never uses the phrase "multiple routes." Instead, it describes spatially dividing the communications channel into multiple paths, creating sub-channels. JA Ex. A, 2:15-25, 3:37-42. Plaintiffs' proposed use of "multiple routes" also ignores the specification's disclosure that there may be a single path for a distinct user. *Id.*, 4:1-6 ("some of the plurality of spatial paths in the identical slot in the PDMA scheme may be used to establish communication in multiple-paths-for-one-user scheme . . . remaining paths may be used to establish communication in one-path-for-one-user scheme").

Second, Defendants' construction is consistent with the objective of the invention: identifying the number of paths that can be formed based on communication status, such as the condition of the communications channel. The claims require a value or information "associated with" the number of spatial paths that are "formable" or "can be [formed/processed]" between two radio devices (*e.g.*, a base station and a mobile terminal). Plaintiffs skip over that key language, but it cannot be disputed that the claims require more than merely transmitting the

number of antennas a device has or other device-specific characteristics. The specification teaches that communication status including channel conditions (*e.g.*, error rate and/or interference measurements) and hardware/antenna failure influence the number of formable paths. *Id.*, 10:40-11:3, 11:14-15, 11:20-26, 11:32-43, 11:47-56. The specification sums up this concept as the "communication status" between two radio devices. *Id.*, 10:30-32 ("[T]he path can be formed in a flexible manner in accordance with a change in communication status between base station CS1 and terminal 1000.").

Using this type of communication status information, a radio device "adaptively" "modifies" or "control[s]" the number of spatial paths formed. *Id.*, 10:12-16, 18:39-50. Every embodiment described in the specification applies this approach. *E.g.*, *id.*, 10:12-16 (first embodiment), 10:65-11:3 (variation of first embodiment), 11:20-36 (second embodiment), 11:48-62 (first variation of second embodiment), 13:39-47 (second variation of second embodiment), 14:64-15:3 (third embodiment, referring back to the first and second embodiments), 17:5-10 (fourth embodiment), 18:34-38 (third and fourth embodiments), 18:39-50 (fifth embodiment). This is true whether the communication status is considered alone or in conjunction with other factors such as a device identifying an aspirational number of paths based on antenna number—the communication status always controls the actual number of paths that can be formed. *Id.*, 9:46-53, 10:12-16.

Indeed, the specification repeatedly describes modifying the number of spatial paths based on communication status as the "present invention":

> [A]n object of the present invention is to provide a radio apparatus capable of adaptive modification in connection of a plurality of paths between a terminal and a base station in accordance with a communication condition in a mobile communication system . . . .

*Id.*, 4:23-30.

> [A]ccording to the present invention, in a terminal or a base station in a mobile communication system adapted to [the/a] MIMO scheme, communication in each spatial path is established by antennas divided into subarrays. As the antennas corresponding to each path or the number of paths are adaptively controlled in accordance with a communication status, stable communication in the MIMO scheme can be achieved.

*Id.*, 19:51-58.

> The present invention is useful in a mobile communication system adapted to the MIMO scheme, because stable communication can be achieved by adaptively controlling the antennas corresponding to each path or the number of paths in accordance with a communication status, in a terminal or a base station in a mobile communication system adapted to the MIMO scheme.

*Id.*, 20:3-10. Given the specification's characterization of considering communication status as the present invention and its inclusion of that concept in every embodiment, a proper construction should make clear that the number of paths formable is based on communication status. *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007) (interpreting "localized wireless gateway system" to require performing compression and packetization at a gateway because the specification described the present invention as doing so); *see also GPNE Corp. v. Apple Inc.*, 830 F.3d 1365, 1371 (Fed. Cir. 2016) (requiring a claimed "node" to "operate[] independently from a telephone network" based on a sentence describing the present invention as a whole).

Plaintiffs' construction does not capture the core concept that the number of paths formable depends on communication status, as disclosed in the specification. JA Ex. A, 4:23-30. Plaintiffs' construction would read out the claim terms "formable" and "can be formed" and replace them with the indefinite concept of an infinite number of routes that could exist under hypothetical conditions, regardless of whether they can be formed based on the communication status.

For these reasons, Defendants' construction should be adopted.

**c. Sisvel's Reply Position**

Defendants' construction hinges on the unsupported assumption that "[d]ividing a communication channel into different 'paths' results in multiple sub-channels." (Joint Br. at 9.) But the specification contains no disclosure of dividing a communications channel into multiple "sub-channels," and Defendants have not identified any.

In fact, the specification expressly distinguishes between spatial paths and channels, and makes clear that channels need not be divided into Defendants' proposed "sub-channels" to be allocated to spatial paths. (*See* JA Ex. A at 3:60-61 ("user 1 is allocated to ***all channels*** via two spatial paths."); 18:20-21 ("***An MIMO channel is set for each subarray*** constituted in the above-described manner for communication (step S606).") (emphases added).) Defendants' construction should be rejected on this basis alone.

The PDMA example Defendants' cite supports Plaintiffs' construction, not Defendants'. In PDMA, single channels—which are frequency bands—are shared in their entirety by users, and ***not divided into smaller frequency bands***. This is accomplished by having users access the relevant base station via different physical paths. (*See*, *e.g.*, JA Ex. A at 2:22-25, 3:37-42.) Importantly, the "spatial division" described in the specification cannot be division of a channel because channels are frequency bands, not subject to physical subdivision.

Defendants also fault Plaintiffs for using the plain-English phrase "multiple routes" because (1) this term is allegedly ambiguous and does not appear verbatim in the specification, and (2) the specification discloses examples where single spatial paths are initially used. (Joint. Br. at 10.) First, the term "route" does not introduce any ambiguity because "route" and "path" are plain-English synonyms. (JA Ex. CC.) The specification and claims repeatedly use the term "paths" (*see*, *e.g.*, JA Ex. A at 9:7-14; 11:32-36; 15:57-59; 17:3-4; 19:54-58), and thus referring to

synonymous "routes" most closely represents that disclosure. Second, the relevant portion of the claim term under construction ("spatial paths") is itself plural, so Defendants' criticism of Plaintiffs' use of the plural in its proposed construction is unfounded.

Defendants are also incorrect that the "number of spatial paths formable" refers only to spatial paths "that may be established based on communication status." The specification teaches that the "number of spatial paths formable" may also be communicated by a radio apparatus as (1) the number of its antenna elements (*see*, *e.g.*, JA Ex. A Fig. 11; col. 2:48-49), or (2) the number of spatial paths to be established with a remote terminal based on the number of antennas capable of normal operation. (*Id.* at 10:13-17; 10:59-64.) Plaintiffs' construction accounts for these additional scenarios. Defendants' construction omits them.

Further, Defendants' construction is inconsistent with other relevant claim language and should be rejected. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc) ("[T]he context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms.") (internal citations omitted). The dependent claims make clear that the "value . . . associated with the number of spatial paths formable" can be transmitted "before a communication" with a remote device. (*See, e.g.*, JA Ex. A, claim 2 ("transmitting the value indicating possible multiplicity to another radio apparatus . . . ***before a communication***") (emphasis added); *see also* JA Ex. B, claim 2; JA Ex. C, claim 5; JA Ex. D, claim 5.) Other relevant dependent claims make clear that the "information on the number of spatial signals" can instead be "transmitted at a control information stage during establishment of the traffic channel." (JA Ex. D, claims 6, 17.) In both cases, the "number of spatial paths formable" is transmitted before any communication has occurred, and thus before it is possible to analyze the "communication status" between the two devices.

Dependent claims 4 and 15 of the ’024 patent add the limitation of “monitoring communication quality,” further suggesting that monitoring “communication status” is subsumed within the otherwise broader scope of the independent claims. *See AK Steel Corp. v. Sollac*, 344 F.3d 1234, 1242 (Fed. Cir. 2003) (“Under the doctrine of claim differentiation, dependent claims are presumed to be of narrower scope than the independent claims from which they depend.”)

Moreover, each asserted claim describes the “number of spatial paths/signals formable” in terms of the capabilities of a single, specific component of the claimed device. (*See, e.g.*, JA Ex. A, claim 1 (“number of spatial paths formable ***by said adaptive array unit***”); *see also*, JA Ex. B, claim 1; JA Ex. C, claim 4; JA Ex. D, claim 1 (emphasis added). There is no mention of the “communication status” between the claimed device and a remote device (or any “communication status” for that matter) in the independent claims. Defendants’ statement that “formable” or “can be [formed/processed]” refers to “two radio devices (*e.g.*, a base station and a mobile terminal),” and Defendants’ characterization of “between two radio devices” as “key language” required by the claims, are therefore both incorrect. (Joint Br. at 10.)

Defendants also confuse the end result described in many disclosed embodiments (the number of spatial paths ***actually formed*** between devices) with the claim term at issue here, “number of spatial paths form***able*** [by the adaptive array unit/communication unit/signal processing unit].” (Joint Br. at 11-12.) The latter is a term that expresses a capability (whether ultimately realized or not) of the claimed unit of the claimed device to form spatial streams—for instance, the number of its antenna elements or the number of antennas capable of normal operation—and not necessarily the number of paths ultimately utilized.

Finally, Defendants point to an “objective of the invention” but nothing in that “objective” overrides the actual claim language or disclosed embodiments. The relevant

question at the claim construction stage is what "the meaning understood by a person of ordinary skill in the art at the time of invention" was, *Mass. Inst. of Tech. v. Shire Pharms., Inc.*, 839 F.3d 1111, 1118 (Fed. Cir. 2016), and not what construction is consistent with a single subjective interpretation of "the objective" of "the invention." *St. Clair Intellectual Prop. Consultants v. Matsushita Elec. Indus. Co.*, 691 F. Supp. 2d 538, 548 (D. Del. 2009) ("There is no requirement that the asserted claims accomplish all of the objectives of the patents-in-suit.") (citing *Phillips*, 415 F.3d at 1327).

As explained above, Defendants' construction is inconsistent with, and Plaintiffs' construction best comports with, the evidence of record. Plaintiffs' construction should therefore be adopted, and Defendants' construction rejected.

**d. Defendants' Sur-Reply Position**

Plaintiffs take issue with Defendants' use of the terms "sub-channel" and "communication status" (Joint Br. at 13-16), but ignore that Defendants' construction correctly captures the key concepts of the invention: dividing a communications channel into spatially-distinct paths that carry distinct signals (*i.e.*, path division) and determining the number of formable paths based on the status of the communications channel and device hardware. Those concepts are not reflected in Plaintiffs' construction, which conflicts with the intrinsic record.

i. The intrinsic record supports Defendants' construction based on "spatially distinct sub-channels"

First, Plaintiffs' construction does not reflect path division. Plaintiffs' arguments assume that a channel is a frequency band and therefore, a sub-channel is a sub-band of frequencies. Joint Br. at 13-14. That is not the case in the context of the intrinsic record. The specification teaches that a channel is the transmission medium between the transmitter and receiver and it can be sub-divided in terms of frequency, time or space. *See*, *e.g.*, JA Ex. A, 2:15-25 (describing spatial

division), 2:58-63 (describing time and path division); 3:53-61 (describing dividing a channel into "two spatial paths"). In fact, the specification explicitly explains that a channel is comprised "of an identical frequency and an identical time slot" that is divided into spatial paths. *Id*., 3:24-28. In other words, the patents do not teach a one-to-one relationship between a channel and frequency band, as Plaintiffs argue; and Defendants' use of sub-channels to refer to the spatially-distinct paths of the sub-divided channel correctly reflects the intrinsic record.

On this issue, the parties' dispute appears to be whether a spatial path is (i) any "route" over which a signal can travel, the number of which is theoretically infinite (Plaintiffs), or (ii) a spatially divided and distinct path that can be formed by the transmitting device (Defendants). Defendants' construction reflects the context in which this term is used in the claimed phrase "number of spatial paths formable [. . .] by [the transmitting device]." JA Ex. A, cl. 1 ("formable by said adaptive array unit"); JA Ex. B, cl. 1 ("formable by said communication unit"); JA Ex. C, cl. 4 (same); JA Ex. D, cl. 1 ("number of spatial signals that can be processed by the signal processing unit"). Plaintiffs' construction, on the other hand, divorces the term "spatial path" from the rest of the claims to seek an overly-broad construction. Specifically, Plaintiffs replace the claim's and specification's teaching of spatially dividing a channel into paths by the transmitting device with the amorphous concept of multiple routes that could exist and have nothing to do with the transmitter. In any case, to the extent the Court believes the term "path" would be more understandable to the jury, Defendants are open to using that term instead of "sub-channel," so long as the concept of spatial division is part of the construction.

ii. <u>"Communication status" determines the number of formable spatial paths</u>

Second, Plaintiffs also dispute the portion of Defendants' construction that requires determining formable "spatial paths" "based on communication status." That requirement is

consistent with the intrinsic record. Indeed, the specification describes controlling the number of spatial paths based on communication status as the "present invention." JA Ex. A, 4:23-30, 19:51-58, 20:3-9. Plaintiffs never address this fact.

Plaintiffs argue instead that Defendants' construction "omits" the number of antennas or the number of antennas capable of normal operation as factors that affect the number of formable spatial paths. Joint Br. at 14. Not so. Plaintiffs misunderstand Defendants' construction. It does not foreclose any factors that influence the number of formable spatial paths, but clarifies (as does the specification) that "communication status" (*i.e.*, channel quality data such as error rates or interference) is always relevant. JA Ex. A, 11:14-15, 11:20-26, 11:32-43, 11:48-56. This is important because Plaintiffs argue that the number of antennas (or the number of normally-operating antennas) alone can determine the number of formable spatial paths. That is not the invention described in the specification and claimed. Joint Br. at 10-12.

Plaintiffs also assert that Defendants' construction is inconsistent with the claims, but Plaintiffs have not accurately described the claims. Joint Br. at 14. First, Plaintiffs argue that some claims require sending the "number of spatial paths formable" before communication status can be evaluated. *Id.* The claims do not say that. They describe transmitting a "value indicating possible multiplicity associated with" or "information on" the "number of spatial [paths/signals]" "before a communication" or "during establishment of the traffic channel." *E.g.*, JA Ex. A, cl. 2; JA Ex. D, cl. 6. As described in the specification, that information could be the total number of device antennas or the number of antennas capable of normal operation. JA Ex. A., 4:48-5:2. While such information affects the number of formable spatial paths, it is not the number of formable spatial paths itself. Determining that number also requires examining communication status after establishing a connection. *Id.*, 10:30-32, 20:3-9. Defendants' construction is consistent

with the claims identified by Plaintiffs because those claims relate to sending the information, not the number of formable paths.

Second, Plaintiffs note that claims 4 and 15 of the ’024 patent require “monitoring communication quality” and conclude, based on claim differentiation, that independent claim 1 must be broader and determine the number of formable spatial paths on factors other than communication status. Joint Br. at 15. The claim language does not yield that result. Neither claim relates to determining the number of formable spatial paths. Instead, the claims recite a device that monitors communication quality so a control unit can “change the number of the antennas allocated” to subarrays based on the results. That operation is not the same as determining the number of formable spatial paths. Thus, claim differentiation does not apply, and Defendants’ construction is consistent with these claims.

Third, Plaintiffs criticize Defendants’ statement that the claims relate to the number of spatial paths that are “formable” or “can be [formed/processed]” between two radio devices. *Id.* Plaintiffs argue the claims relate instead to “the capabilities of a single, specific component of the claimed device.” *Id.* The claim language and specification support Defendants. Claim 1 of the ’103 patent describes “[a] radio apparatus capable of communicating with another radio apparatus by forming a plurality of spatial paths therebetween.” The specification also describes a spatial path as connecting two devices. JA Ex. A, Abstract.

Plaintiffs further argue that Defendants identify the phrase “between two radio devices” as key language. Joint Br. at 15. To the contrary, Defendants refer to “formable” or “can be [formed/processed]” as key claim language (Joint Br. at 10-11.) because the specification ties those words to communication status. JA Ex. A, 10:30-32. Plaintiffs then accuse Defendants of conflating the number of formable paths with the number of paths actually formed. Joint Br. at

15. There is no such confusion. Defendants interpret "formable" and "can be [formed/processed]" to mean the number of spatial paths that a device can form based on hardware considerations (*e.g.*, number of antennas) and channel conditions (*e.g.*, interference). That determination does not require actually forming the paths.

Further, Plaintiffs argue that the claims require merely the "capability" to "form spatial streams." *Id.* at 15. But the claims do not use the word "capable," which suggests some abstract, hypothetical ability untethered to real-world conditions. They use "formable" (or its equivalent) which requires determining the number of possible spatial paths under applicable physical constraints, including communication status.

Lastly, Plaintiffs accuse Defendants of relying on a mere "objective of the invention." *Id.* But the specification does more than identify controlling the number of spatial paths based on communication status as an objective. It twice states unambiguously that spatial path division based on communication status is the "present invention." JA Ex. A, 19:51-58, 20:3-9. Plaintiffs offer no answer to those passages or Defendants' cited case law (Joint Br. at 11-12).

**3. "adaptive array unit capable of performing adaptive array processing on signals corresponding to a plurality of antennas"; "adaptive array unit" / "signal processing unit" / "adaptive array processing" / "signal processing unit capable of processing spatial signals to be transmitted through the plurality of transmission units and the plurality of antennas" – Claims 1 and 4 of the '103 patent; Claims 1 and 12 of the '024 patent**

| Plaintiffs' proposed construction | Defendants' proposed construction |
|---|---|
| A hardware or software apparatus capable of feedback processing in transmitting or receiving signals corresponding to a plurality of antennas | an apparatus that creates and updates weighting vectors consisting of signal coefficients for transmission and reception directivity<br><br>creating and updating weighting vectors consisting of signal coefficients for transmission and reception directivity |

**a. Sisvel's Opening Position**

The terms "adaptive array unit" and "signal processing unit" are used interchangeably in the common specification of the '103 and '024 patents. For instance, Fig. 1 depicts an Adaptive Array Processing Unit USP, which is described in the specification as a "signal processing unit USP," in a remote PDMA terminal. (JA Ex. A at Fig. 1; 8:37-38.) The arguments below apply to the constructions of both claim limitations, and all references to "adaptive array unit" should be understood to refer to "signal processing unit" and vice versa.

Plaintiffs' proposed construction is fully consistent with the embodiments of the specification, while Defendants' proposal would exclude features of the preferred embodiments. The specification is replete with examples of the adaptive array processing unit performing feedback processing in transmitting or receiving signals corresponding to a plurality of antennas, consistent with Plaintiffs' construction. In one embodiment, the base station may adaptively adjust the number of paths between the devices. (*Id.* at 10:12-21.) In another embodiment, a remote terminal may notify the base station of various communication parameters including the number of antenna elements or the maximum number of paths it can communicate over. (*Id.* at 12:30-32.)

The remote terminal may also notify the base station of quality information for each spatial path, or information on the antenna allocated to each path. (*Id.* at 11:32-35.) The remote terminal may evaluate the frame error rate (FER) associated for each path and compare the aggregate FER for all paths to a prescribed threshold. (*Id.* at 12:35-40.) If an increase in the number of paths would improve communication speed, the remote terminal may notify the base station accordingly and, provided the base station grants permission, the remote terminal

increments the number of paths and selects the appropriate number of antenna subarrays for communication. (*Id.* at 12:47-57.)

Fig. 7 is a flowchart illustrating the algorithm for such adaptive control of the number of paths to be set in the aforementioned embodiment, based on a feedback process between the base station and the remote terminal. (*Id.* at Fig. 7; 12:20-24.) Figures 8, 12, 14, 15, and 16 of the specification similarly illustrate algorithms for adaptive control of the number of paths to be set in other embodiments.

This intrinsic evidence demonstrates the broad scope of the kinds of feedback processing the adaptive array processing unit can perform in transmitting or receiving signals corresponding to a plurality of antennas. Plaintiffs' construction accounts for the full array of processing embodiments taught by the specification. Nothing in the prosecution history alters or narrows the meaning of these terms.

By contrast, Defendants' proposed construction is needlessly narrow. Defendants argue that an adaptive array processing unit merely "creates and updates weighting vectors consisting of signal coefficients for transmission and reception directivity"—functionality described in one single example in the Background Art section of the specification. (*Id.* at 2:26-37; 3:12-19.) But nowhere in Defendants' intrinsic evidence is there any justification for so restricting the phrase "adaptive array processing unit" when describing the claimed MIMO radio apparatuses of the invention.

Indeed, regardless of how a received signal is extracted (i.e., whether using "weighting vectors," "signal coefficients," or any other manner), what is common to multiple embodiments is that adaptive control of received or transmitted signals is based on information exchanged between both radio apparatuses using a feedback process. (*See*, *e.g.*, *id.* at Figs. 7, 8, 12, 14, 15,

16; 12:35-40; 12:47-57; 13:33-36; 13:48-56; 15:54-64; 18:6-19.) Because Defendants' narrow construction would exclude key features of all embodiments in the specification, it should be rejected. *Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, 362 F.3d 1367, 1381 (Fed. Cir. 2004) ("[A] claim interpretation that excludes a preferred embodiment from the scope of the claim 'is rarely, if ever, correct.'") (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996)); *see also Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F. 3d 1318, 1326 (Fed. Cir. 2013); *On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133, 1138 (Fed. Cir. 2004); *Int'l Rectifier Corp. v. IXYS Corp.*, 361 F.3d 1363, 1371 (Fed. Cir. 2004); *Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1550 (Fed. Cir. 1996).

Plaintiffs' proposed construction encompasses the full scope of the term as described by the specification and should be adopted.

**b. Defendants' Answering Position**

Defendants agree with Plaintiffs that the terms "adaptive array unit" and "signal processing unit" are "used interchangeably in the common specification of the '103 and '024 patents." (Joint Br. at 21). While Plaintiffs present two different constructions for those terms, they discuss only the construction of "adaptive array unit" and refer to it throughout as "Plaintiffs' construction." *Id.* at 21-23. For the reasons below, these terms should be considered together and assigned Defendants' constructions.[6] *See Nystrom v. Trex Co.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005) ("Different terms or phrases in separate claims may be construed to cover the same subject matter where the written description and prosecution history indicate that such a reading of the terms or phrases is proper.").

---

[6] Defendants' second construction reflects that the second phrase involves the act of processing, as opposed to a processor.

The claims recite an adaptive array unit that performs "adaptive array processing" or require "adaptive array processing" itself. The specification describes what this claim language means in the context of the '103 and '024 patents:

> In an adaptive array processing, based on a reception signal from a terminal, a weight vector consisting of reception coefficients (weights) for respective antennas in the base station is calculated for adaptive control, and a signal from a desired terminal is accurately extracted.
>
> With such an adaptive array processing, an uplink signal from the antenna of each user terminal is received by the array antenna of the base station, and then separated and extracted with reception directivity. A downlink signal from the base station to the terminal is transmitted from the array antenna with transmission directivity to the antenna of the terminal.

JA Ex. A, 2:26-37. The specification continues by stating that "adaptive array processing is a well-known technique" and, "[t]herefore, description of its operation principle will not be provided." *Id.*, 2:38-43.

Other references in the specification to "adaptive array processing" are consistent. For example, the specification describes a known "adaptive array radio base station" that "performs weight vector control (determines weight coefficient) so as to extract a signal" (*id.*, 3:13-19), as well as another base station in which "signals are separated and extracted with reception directivity through the above-described adaptive array processing" (*id.*, 3:43-52). In the preferred embodiments and figures of the '103 patent, "adaptive array processing" is performed by the "USP," which is referred to as both the "signal processing unit" and the "adaptive array processing unit." *See id.*, 8:37-46, Figs. 1, 4-6, 13. Consistent with the representation that "description of [adaptive array processing] . . . will not be provided," the discussion of the "USP" is limited, though the specification does note that it is used for "subjecting signals from transmission/reception units TRP1 to TRP4 to adaptive array processing . . . so as to form transmission directivity to the base station during communication." *Id.*, 8:37-43. Defendants'

construction should be adopted because it aligns with the description of "adaptive array processing" throughout the specification.

Plaintiffs do not argue that the description of "adaptive array processing" in the specification is inaccurate or dispute that "adaptive array processing" was, in fact, "well-known." Instead, Plaintiffs take issue with Defendants' construction because it allegedly describes "functionality described in one single example in the Background Art section of the specification." (Joint Br. at 22.) This criticism is unfounded.

First, as discussed above, the specification repeatedly associates the concepts of "weighting vectors" and "directivity" with "adaptive array processing," as well as the "USP" that performs "adaptive array processing." *See, e.g.*, JA Ex. A, 2:26-37, 3:12-19, 3:43-52, 8:37-43. Second, the specification describes that "adaptive array processing is a well-known technique." *See id.*, 2:38-43. It should come as no surprise that this "well-known" functionality is described only briefly in the specification. Third, to the extent Plaintiffs are arguing that it is improper to rely on statements in the Background section of the specification for purposes of claim construction, the law says otherwise. *See, e.g., Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1317 (Fed. Cir. 2014) (relying on statement in the background art section to construe the claim); *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1306 (Fed. Cir. 2011) (same).

Plaintiffs also argue that Defendants' construction would "exclude features of the preferred embodiments" because the specification is "replete with examples of the adaptive array processing unit performing feedback processing in transmitting or receiving signals." (Joint Br. at 21.) That is incorrect. Plaintiffs' argument confuses "adaptive array processing" with feedback processing performed by other units. The "feedback processing" Plaintiffs identify is

performed by the separately described—and separately claimed—"control unit," not the adaptive array processing unit. JA Ex. A, 8:46-50. For example, Plaintiffs cite to an embodiment discussed in the specification that uses a frame error rate (FER) to control antenna subarray selection, asserting that "feedback processing" is performed by the adaptive array processing unit. *See* Joint Br. at 22. But the specification states the "control unit CNP" performs that function. JA Ex. A, 11:20-26. Indeed, an excerpt of Figure 5 (a schematic of the second embodiment) depicts the FER counter (yellow) in communication with the control unit (CNP), not with the separately identified adaptive array processing unit (USP).

FIG.5




Plaintiffs argue that Figures 7, 8, 12, 14, 15, and 16 show algorithms for "adaptive control." But these figures also illustrate control algorithms carried out by the control unit, not by the adaptive array processing unit. For example, Figures 7 and 8 relate to alleged feedback control carried out by the control unit CNP. *See id.*, 12:20-22, 13:29-31. This point is even clearer for Figure 14. The specification expressly states (twice) that Figure 14 "is a flowchart illustrating an operation of a control circuit CNP and a subarray selector 32," both of which are separate from the adaptive array processing unit. *Id.*, 7:61-62, 17:43-45, Fig. 13. Defendants' construction does not "exclude the preferred embodiments" because, contrary to Plaintiffs' arguments, the specification does not describe the "adaptive array unit" as the unit responsible for "feedback processing" or "adaptive control."

For much the same reasons, Plaintiffs' attempt to broadly construe the "adaptive array unit" as a hardware or software apparatus "capable of feedback processing" should be rejected. The phrase "feedback processing" appears nowhere in the specification, and the alleged "examples of the adaptive array processing unit performing feedback processing" throughout the specification are actually operations of the control unit. Joint Br. at 21.

Finally, Plaintiffs' construction disregards, without justification, the statements in the specification linking "adaptive array processing," the exact phrase at issue, with the generation of "weighting factors" for use in "directivity." In essence, Plaintiffs ask the Court to find that "adaptive array processing," when used in certain portions of the specification or the claims, has a different meaning than when that exact same phrase is used in other portions of the specification. There is no reason for such an inconsistent conclusion.

**c. Sisvel's Reply Position**

The specification explicitly states that "adaptive array processing is a well-known technique" and that a "description of its operating principle will not be provided" (JA Ex. A, 2:38-43), and Defendants have acknowledged this fact. (Joint Br. at 24, citing JA Ex. A at 2:38-43.) Nonetheless, Defendants construe "adaptive array processing" as being limited to a single disclosed example involving "creating and updating weighting vectors consisting of signal coefficients." This contradicts the explicit disclosure of the specification—the "single best guide to the meaning" of this term—and is therefore improper. *Phillips*, 415 F.3d at 1315.

Defendants rely on an annotated form of Figure 5 of the specification and argue that functional blocks USP ("Adaptive Array Processing Unit") and CNP ("Control Unit") are wholly independent of each other, so the functionality identified by Plaintiffs cannot be performed by the adaptive array processing unit USP. Plaintiffs, however, do not argue that the adaptive array

unit is the *only* unit that performs feedback processing. Moreover, the '103 patent contemplated that much of the functionality of the terminal in Figure 5 could be implemented as an integrated software system. (*See* JA Ex. A at 11:27-31.) As such, a POSITA would have understood that any adaptive processing algorithms may overlap with and be indistinguishable from the feedback processing algorithms identified by Plaintiffs (and which Defendants contend are implemented only by the control unit) if all of these "units" were implemented on a single processor. Defendants are, therefore, wrong in arguing for an overly narrow construction of this term.

**d. Defendants' Sur-Reply Position**

The specification explains what is meant by "adaptive array processing" in the context of these patents. Joint Br. at 24-25 (citing JA Ex. A, 2:26-37). Plaintiffs' attempt to downplay the specification's teachings as merely "a single disclosed example" fails, particularly because the specification includes no such qualification. Joint Br. at 27. Moreover, Plaintiffs continue to ignore other teachings throughout the specification associating the concepts of "weighting vectors" and "directivity" with "adaptive array processing" and the "USP" that performs "adaptive array processing." *See, e.g.*, JA Ex. A, 2:26-37, 3:12-19, 3:43-52, 8:37-43. In discussing another disputed term ("reception operation"), Plaintiffs even admit that ascribing a "weight" to each antenna is a "key aspect[] of adaptive array reception." Joint Br. at 63.

As Defendants explained, the examples of "feedback processing" identified in Plaintiffs' Opening Brief are performed by the "control unit," not the "adaptive array processing unit." Joint Br. at 25-26. Faced with this reality, Plaintiffs now argue that "a POSITA would have understood that any adaptive processing algorithms may overlap with and be indistinguishable from the feedback processing algorithms" if the functionality of Figure 5 was implemented as an "integrated software system." Joint Br. at 28. But Plaintiffs make no attempt to support this hypothesis.

Moreover, "adaptive array unit" and "signal processing unit" are recited separately from "control unit/means" in the claims at issue, and the claims do not mention the "integrated software system" theorized by Plaintiffs. *See* JA Ex. A, cls. 1, 4; JA Ex. D, cls. 1, 12.

**4. "a value indicating possible multiplicity" / "a value indicating possible multiplicity associated with the [number of spatial paths formable]" – Claims 1 and 4 of the '103 Patent; Claims 1 and 4 of the '115 Patent; Claims 1, 4 and 7 of the '851 Patent; "information on the number of spatial signals that can be processed by the signal processing unit" – Claims 1 and 12 of the '024 Patent**

| Plaintiffs' proposed construction | Defendants' proposed construction |
| --- | --- |
| Numerical data field conveying that the radio apparatus is capable of forming multiple spatial paths with a second radio apparatus | a value, other than in the form of a codebook, identifying the [number of spatially distinct sub-channels that may be established based on communication status] |

**a. Sisvel's Opening Position**

Because the scope of the term "a value indicating possible multiplicity associated with the [number of spatial paths formable]" is coextensive with the term "information on the number of spatial signals that can be processed by the signal processing unit" in the specification, the arguments below apply to the constructions of both claim terms, and all references to one term should be understood to refer to the other and vice versa. For these terms, Plaintiffs' proposed construction is fully consistent with the intrinsic record, while Defendants' proposed construction violates multiple tenets of claim construction.

In prior art MIMO transmissions, radio apparatuses would prepare a number of antennas corresponding to the number of paths to be set. (JA Ex. A at 4:10-12.) However, fixing the number of antennas often hindered the ability of the radio apparatus to correct for errors caused by a failure in a spatial path, eventually affecting the communication speed. (*Id.* at 4:13-22.) To address this issue, the claimed inventions included a storage unit for storing in advance a value indicating possible multiplicity associated with the number of spatial paths formable by the

claimed radio apparatuses ('103, '115, and '851 patents), also known as information on the number of spatial signals that can be processed by the signal processing unit ('024 patent), so that the number of spatial paths may be subsequently adjusted as required. (*See*, *e.g.*, *id.* at 4:40-45; 4:48-49; 4:52-55; 8:37-41; 8:50-51; 9:15-22.)

The specification provides three examples of parameters that indicate whether the claimed radio apparatus can form a plurality of spatial paths with a remote radio apparatus. For instance, the claimed radio apparatus may store: (1) information on the number of its antennas ("antenna number information") (*id.* at 4:48-49; 8:50-52; 15:27-29); (2) information on the maximum number of its antennas that can attain normal reception (*id.* at 4:56-59; 10:55-58); or (3) information on the number of spatial paths that it can use for multiplex communication (*id.* at 4:62-65), which might differ from the number of antennas if the claimed radio apparatus is using subarrays. (*Id.* at 9:41-45.))

Transmitting one of these parameters conveys to the remote device whether the claimed radio apparatus is capable of forming multiple spatial paths with the remote device. (*See*, *e.g.*, *id.* at Figs. 7, 8, 11, 12, 15.) Hence, each of these values (and any similar type of value) is "a value indicating possible multiplicity associated with the [number of spatial paths formable]." Plaintiffs' construction—"numerical data field conveying that the radio apparatus is capable of forming multiple spatial paths with a second radio apparatus"—accounts for each of the disclosed embodiments and is consistent with the scope of the specification, without reading in isolated limitations from any single embodiment. Plaintiffs' construction should therefore be adopted.

Defendants' proposed construction suffers from three fatal errors and should be rejected. First, as discussed above in Section II.B.1., the term "sub-channels" is ambiguous and does not

appear anywhere in the intrinsic evidence. Second, as discussed above in Section II.B.2., Defendants' proposed restriction that the "number of spatial paths formable" be limited to those "established based on communication status" excludes disclosed embodiments of the invention and is therefore improper. *See EPOS Technologies Ltd.*, 766 F.3d at 1347; *In re Katz Interactive Call Processing Patent Litigation*, 639 F.3d at 1324. Third, by restricting the claimed "value" to "a value, other than in the form of a codebook," Defendants overreach in attempting to make a prosecution disclaimer argument. For the reasons below, Defendants' disclaimer argument fails and should be disregarded.

While a patent's prosecution history is relevant to the claim construction analysis, any disclaimer of claim scope based on prosecution history must be "clear and unmistakable." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325-26 (Fed. Cir. 2003). Here, Defendants fall far short of this threshold in relying on excerpts from the prosecution histories of the '103 patent and its parent '461 patent relating to prior art references U.S. Pat. No. 6,859,503 ("Pautler") (JA Ex. Q) and No. 6,901,062 ("Scherzer") (JA Ex. R). During prosecution of the '103 patent, the applicant argued that because Pautler "describes a codebook which appears to teach, for example, a weight related to a directivity of an antenna," the Pautler codebook was "different from the claimed value indicating possible multiplicity." (JA Ex. J at 6.) Similarly, during prosecution of the '461 patent, the applicant explained that the Pautler codebook, unlike the claimed "value" here, specified only "modulation and error encoding schemes, and power allocation for each data stream." (JA Ex. P at 4.)

Importantly, nowhere did the applicant argue that the claimed value indicating possible multiplicity could not be in the form of a codebook at all (which is what Defendants now propose). Rather, the applicant distinguished a specific codebook having other types of

parameters, for example "a weight related to a directivity of an antenna." (JA Ex. J at 6.) The Applicant noted that these parameters fell outside the scope of the claimed "value indicating possible multiplicity" of spatial streams. (*Id*. at 6.)

As the applicant made no clear and unmistakable disclaimer of codebooks in general—or made any statements at all regarding codebooks in general—it is improper for Defendants to read in such a broad disclaimer into the claims at issue.

Plaintiffs' proposed construction, on the other hand, comports with the specification and prosecution history and should be adopted.

**b. Defendants' Answering Position**

As an initial matter, the parties agree that the constructions of these phrases are related and that the same arguments apply to both. However, the parties disagree regarding two aspects of the construction: (i) the meaning of the number of spatial signals that can be formed and (ii) whether the value/information can be contained within a codebook.

First, the claims themselves require that the value indicating possible multiplicity be "associated with" the number of spatial paths formable. The parties' claim construction dispute regarding the number of formable spatial paths is addressed above and equally applies here.

Second, the parties dispute whether the value or information can take the form of a codebook. For context, a "codebook" is a lookup table where an index number identifies a record that includes additional information, such as transmission parameters. Using the index number and the codebook, it is possible to "look up" the parameters. Examples of "codebooks" with parameters relating to multiple spatial streams are shown below, where the first example is from prior art (U.S. Patent No. 6,859,503 ("Pautler")) cited during prosecution of the patents and the second example is from the IEEE 802.11n Wi-Fi standard cited throughout Plaintiffs'

Amended Complaints. Plaintiffs allege that the second example, which is an "MCS" codebook in the IEEE 802.11n Wi-Fi standard, meets the claim limitation of a value indicating possible multiplicity associated with the number of spatial paths formable (and related terms). *E.g.*, Case No. 17-cv-948-RGA (D. Del.) D.I. 9 ¶¶ 32, 34.

**Prior Art Pautler Reference**

**(JA Ex. Q, 12:27-44)**

TABLE 1

| Configuration # | Modulator #1 | Code #1 | Modulator #2 | Code #2 | Power 1 | Power 2 |
|---|---|---|---|---|---|---|
| 1 | QPSK | R=1/2 | — | R=1/2 | 1 | 0 |
| 2 | QSPK | R=1/2 | QPSK | R=112 | 0.5 | 0.5 |
| 3 | 16 QAM | R=1/2 | — | R=1/2 | 1 | 0 |
| 4 | 16 QAM | R=112 | QPSK | R=1/2 | 0.5 | 0.5 |
| 5 | 16 QAM | R=1/2 | 16 QAM | R=1/2 | 0.5 | 0.5 |
| 6 | 64 QAM | R=1/2 | — | R=1/2 | 1 | 0 |
| 7 | 64 QAM | R=1/2 | QPSK | R=1/2 | 0.5 | 0.5 |
| 8 | 64 QAM | R=1/2 | 16 QAM | R=1/2 | 0.5 | 0.5 |
| 9 | 64 QAM | R=1/2 | 64 QAM | R=1/2 | 0.5 | 0.5 |
| 10 | 256 QAM | R=1/2 | — | R=1/2 | 1 | 0 |
| 11 | 256 QAM | R=1/2 | QPSK | R=1/2 | 0.5 | 0.5 |
| 12 | 256 QAM | R=1/2 | 16 QAM | R=1/2 | 0.5 | 0.5 |
| 13 | 256 QAM | R=1/2 | 64 QAM | R=1/2 | 0.5 | 0.5 |
| 14 | 256 QAM | R=1/2 | 256 QAM | R=1/2 | 0.5 | 0.5 |

**Accused MCS Codebook**

**(Case No. 17-cv-948-RGA (D. Del.) D.I. 9 ¶¶ 32, 34, 47, 49, 62, 64, 79, 81)**

The rate-dependent parameters for optional 20 MHz, $N_{SS}$ = 3 MCSs with $N_{ES}$ = 1 and EQM of the spatial streams shall be as shown in Table 20-31.

**Table 20-31—MCS parameters for optional 20 MHz, $N_{SS}$ = 3, $N_{ES}$ = 1, EQM**

| MCS Index | Modulation | $R$ | $N_{BPSCS}(i_{SS})$ | $N_{SD}$ | $N_{SP}$ | $N_{CBPS}$ | $N_{DBPS}$ | Data rate (Mb/s) | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | 800 ns GI | 400 ns GI |
| 16 | BPSK | 1/2 | 1 | 52 | 4 | 156 | 78 | 19.5 | 21.7 |
| 17 | QPSK | 1/2 | 2 | 52 | 4 | 312 | 156 | 39.0 | 43.3 |
| 18 | QPSK | 3/4 | 2 | 52 | 4 | 312 | 234 | 58.5 | 65.0 |
| 19 | 16-QAM | 1/2 | 4 | 52 | 4 | 624 | 312 | 78.0 | 86.7 |
| 20 | 16-QAM | 3/4 | 4 | 52 | 4 | 624 | 468 | 117.0 | 130.0 |
| 21 | 64-QAM | 2/3 | 6 | 52 | 4 | 936 | 624 | 156.0 | 173.3 |
| 22 | 64-QAM | 3/4 | 6 | 52 | 4 | 936 | 702 | 175.5 | 195.0 |
| 23 | 64-QAM | 5/6 | 6 | 52 | 4 | 936 | 780 | 195.0 | 216.7 |

This background is important because, during prosecution, the applicants distinguished the claimed "value indicating possible multiplicity" from the codebook values in Pautler (the first codebook above). Accordingly, Defendants' constructions exclude information in the form

of a codebook, just as the applicants excluded codebook values to distinguish the Pautler reference during prosecution. On the other hand, Plaintiffs' constructions are an attempt to improperly recapture codebook values, such as those in the MCS codebook that is the focus of their infringement allegations (the second codebook above).

During the prosecution of the four asserted patents relevant to this limitation and their parent, U.S. Patent No. 7,539,461, the examiner repeatedly rejected all claims over Pautler, among other references. In rejecting the claims of the '103 patent, the examiner stated that Pautler teaches "storing beforehand information on possible multiplicity associated with the number of spatial paths." JA Ex. V at 3. At the time of this exemplary rejection, the claims of the '103 patent included "information on possible multiplicity associated with the number of spatial paths . . . ." JA Ex. J at 3. The examiner relied on disclosures in Pautler describing a system for increasing data rate by transmitting multiple data streams (JA Ex. Q, Abstract), including transmitting a "codebook index" that could be used "to lookup transmission parameters in [a] codebook 76 within memory" (*id.*, 7:9-20). The examiner further cited Pautler's teaching that the codebook could be used to "select a forward error correction coding scheme, a modulation scheme, a power allocation for each data stream, and a selection of antennas in the transmit antenna array." JA Ex. V at 3 (citing JA Ex. Q, 11:64-12:4).

Pautler's codebook associated a "Configuration #" (*e.g.*, an index number) with parameters indicating whether the transmitter is sending one or two spatial streams, as shown in Table 1. For example, Configuration #1 indicates that only one spatial stream will be sent using "Modulator #1" as reflected by the listed QPSK modulation scheme and the absence of any modulation scheme for Modulator #2 and the power allocations for both data streams.

TABLE 1

| Configuration # | Modulator #1 | Code #1 | Modulator #2 | Code #2 | Power 1 | Power 2 |
|---|---|---|---|---|---|---|
| 1 | QPSK | R=1/2 | — | R=1/2 | 1 | 0 |
| 2 | QSPK | R=1/2 | QPSK | R=112 | 0.5 | 0.5 |
| 3 | 16 QAM | R=1/2 | — | R=1/2 | 1 | 0 |
| 4 | 16 QAM | R=112 | QPSK | R=1/2 | 0.5 | 0.5 |
| 5 | 16 QAM | R=1/2 | 16 QAM | R=1/2 | 0.5 | 0.5 |
| 6 | 64 QAM | R=1/2 | — | R=1/2 | 1 | 0 |
| 7 | 64 QAM | R=1/2 | QPSK | R=1/2 | 0.5 | 0.5 |
| 8 | 64 QAM | R=1/2 | 16 QAM | R=1/2 | 0.5 | 0.5 |
| 9 | 64 QAM | R=1/2 | 64 QAM | R=1/2 | 0.5 | 0.5 |
| 10 | 256 QAM | R=1/2 | — | R=1/2 | 1 | 0 |
| 11 | 256 QAM | R=1/2 | QPSK | R=1/2 | 0.5 | 0.5 |
| 12 | 256 QAM | R=1/2 | 16 QAM | R=1/2 | 0.5 | 0.5 |
| 13 | 256 QAM | R=1/2 | 64 QAM | R=1/2 | 0.5 | 0.5 |
| 14 | 256 QAM | R=1/2 | 256 QAM | R=1/2 | 0.5 | 0.5 |

Configuration #2 indicates that two spatial streams will be sent using QSPK modulation (see Modulator #1 and Modulator #2). Pautler taught that, using this codebook, the transmitter conveys transmission parameters such as modulation, error encoding rate, and power allocation for each data stream. JA Ex. Q, 12:20-24; *see also id.*, 13:30-32.

In response to the examiner's positions, the applicants amended the claims to overcome the rejection. First, the applicants changed "information on possible multiplicity" to "a value indicating possible multiplicity." JA Ex. J at 3. The applicants then argued that Pautler's "codebook is different from the claimed value indicating possible multiplicity" and that "Pautler does not teach, among other things, storing beforehand <u>a value indicating possible multiplicity</u> associated with the number of spatial paths formable . . . ." *Id.* at 6-7. In view of this argument, the examiner withdrew the rejection based on Pautler.

By making these amendments and accompanying arguments to overcome the examiner's rejection based on Pautler's codebook, the applicants unequivocally surrendered claim scope including codebook values that convey the number of spatial streams, like in Pautler.[7] *See Bd. of Regents of the Univ. of Tex. Sys. v. BENQ Am. Corp.*, 533 F.3d 1362, 1369 (Fed. Cir. 2008) ("the prosecution history may be given substantial weight in construing a term where that term was

[7] The examiner issued similar claim rejections during prosecution of the '115 and '851 patents, and the applicants made identical arguments to distinguish Pautler, which the examiner accepted. JA Ex. X at 4-5; JA Ex. Y at 5-6.

added by amendment"). The applicants disclaimed that the terms "value" and "information" encompass codebook values that indicate the number of spatial streams, which is claim scope Plaintiffs impermissibly now seek to recapture. *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 740 (2002) ("A patentee's decision to narrow his claims through amendment may be presumed to be a general disclaimer of the territory between the original claim and the amended claim")[8]; *see also RFID Tracker, Ltd. v. Wal-Mart Stores, Inc.*, 342 F. App'x 628, 630 (Fed. Cir. 2009) ("[i]f the applicant unequivocally disavows claim scope, the doctrine of prosecution disclaimer applies even if the disclaimer results in a negative claim limitation").

"'[B]y distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover.'" *Spectrum Int'l, Inc. v. Sterilite Corp*, 164 F.3d 1372, 1378-79 (Fed. Cir. 1998) (citation omitted). "Prosecution arguments [that] draw distinctions between the patented invention and the prior art are useful . . . since they indicate in the inventor's own words what the invention is not." *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1330 (Fed. Cir. 2007). While Plaintiffs criticize the reference to a codebook in Defendants' construction as a negative limitation, the disclaimer during prosecution supports such a limitation. *See, e.g.*, *Medicines Co. v. Mylan Inc.*, No. 11-cv-1285, 2012 WL 3234282, at *15 (N.D. Ill. Aug. 6, 2012) ("negative limitations, which describe the invention in terms of what it is not rather than what it is . . . are permissible when they are justified by clear disavowal or disclaimer").

---

[8] While *Festo* relates to prosecution history estoppel and not prosecution history disclaimer, the Federal Circuit has recognized that the same general principles apply to both. *See Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1064 (Fed. Cir. 2016) ("disclaimer 'ensures that claims are interpreted by reference to those that have been cancelled or rejected'") (citation omitted).

Plaintiffs' proposed construction is incorrect because it recaptures subject matter that Pautler discloses. During prosecution, the applicants stated unequivocally that "Pautler does not teach . . . a value indicating possible multiplicity." JA Ex. J at 6-7. Yet, Plaintiffs' construction attempts to recapture Pautler's codebook parameters that identify the number of spatial streams. Plaintiffs pursue that broad construction because of their infringement read. According to Plaintiffs, the accused MCS codebook (see above) describes values associated with the number of spatial paths, just like Pautler. *E.g.*, Case No. 17-cv-948-RGA (D. Del.) D.I. 9 ¶¶ 32, 34. But Plaintiffs cannot have it both ways. They cannot construe the claims one way to avoid invalidity and another to argue infringement. *Graham v. John Deere Co.*, 383 U.S. 1, 33 (1966) ("Claims as allowed must be read and interpreted with reference to rejected ones and to the state of the prior art; and claims that have been narrowed in order to obtain the issuance of a patent by distinguishing the prior art cannot be sustained to cover that which was previously by limitation eliminated from the patent."); *see also Comput. Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1375 (Fed. Cir. 2008) ("[C]laims should not be construed 'one way in order to obtain their allowance and in a different way against accused infringers.'"). It is appropriate and necessary to hold Plaintiffs to the statements made during prosecution and construe these phrases to exclude codebook values from their scope.

**c. Sisvel's Reply Position**

Defendants incorrectly argue that the applicant distinguished this term from a value "in the form of a codebook." Contrary to this argument, at no time during prosecution did the applicant disclaim "codebooks" generally (or even mention codebooks generally) or ever say or imply that the claimed "value indicating possible multiplicity" could not be contained within a table or codebook. During prosecution of the '103 and '461 patents, the Examiner cited a

specific codebook denoted by Table 1 of *Pautler* (reproduced below) and suggested that Table 1 taught "***information*** on possible multiplicity," a claim term that was eventually amended to "value indicating possible multiplicity."

While the Examiner argued that the *Pautler* codebook ***as a whole*** could be said to convey "***information on*** possible multiplicity," the applicant amended the claim language to read "***value indicating*** possible multiplicity" and pointed out that the *Pautler* codebook:

> is used to specify modulation and error encoding schemes, and power allocation for each data stream (col. 12, lines 20-25). As one skilled in the art would realize these data do not provide information on possible multiplicity associated with a number of spatial paths, as the claims recite. Hence, the codebook 76 does not store in advance information on multiplicity, as the claims require.

(JA Ex. P at 4.)

Thus, the applicant only contrasted the claimed "value indicating possible multiplicity" with the specific codebook described in *Pautler*. At no time did the applicant argue generally that the claimed "value indicating possible multiplicity" could not be included in tables or codebooks. There was therefore no "clear and unmistakable disavowal" of codebooks generally or of values included in tables or codebooks generally, as would be required for the type of disclaimer Defendants are seeking. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325-26 (Fed. Cir. 2003).

Defendants cite no support for their contention that the first column alone in *Pautler*'s Table 1 represents a "codebook index" that indicates "whether the transmitter is sending one or two spatial streams." (Joint Br. at 35.) This is perhaps because *Pautler* does not disclose ***any*** relationship between the "Configuration #" in Table 1 and the number of potential ***spatial streams***. The "data stream[s]" taught by *Pautler* are not the same as the "spatial paths" or "spatial streams" claimed here as they do not correspond to a plurality of routes between the

antennas of the transmitter and receiver.[9] Defendants' argument relating to disclaimer of any and all "codebooks" or "codebook indices" is, thus, without merit.

Indeed, Defendants' claim construction appears to be driven solely by their putative non-infringement positions regarding the 802.11n "MCS" table identified by Plaintiffs (Table 20-31 as reproduced by Defendants). Defendants argue that these qualify as "codebooks," using a sweeping definition of "codebook" that would effectively include in any table of numbers. (Joint Br. at 33.) This argument mischaracterizes Plaintiffs' contention, which relies solely on the "MCS Index" values within the MCS table as the recited "value indicating possible multiplicity," not the entirety of the table.

Importantly, the term "codebook value" that Defendants use repeatedly appears nowhere in the prosecution history or specification. It is a term designed to confuse the "value" from the 802.11n standard that Plaintiffs are accusing with a very specific type of table—again, discussed as a whole—during prosecution. More importantly, there is zero evidence to support the extensive disclaimer Defendants are seeking, which would preclude infringement by any value within any table, regardless of whether that value or table bears any likeness to the specific "codebook" of *Pautler*.

Regardless, Plaintiffs are not "attempt[ing] to recapture" any value "in the ***form of*** a codebook," and any non-infringement arguments are properly the subject of expert discovery, not claim construction. Defendants' proposed construction of this term should be rejected in favor of Plaintiffs' construction, which comports with the intrinsic evidence and the patentee's intended meaning.

[9] Defendants do not argue that "data streams" are equivalent to "spatial paths" even under their proposed construction of the term "spatial paths."

**d. Defendants' Sur-Reply Position**

The parties' dispute focuses on the impact of statements and claim amendments made by the applicants during prosecution of the asserted patents. *Compare* Joint Br. at 34-37 *with* Joint Br. at 37-39. It is beyond dispute that the examiner rejected the applicants' then-proposed claims based on the Pautler reference and that the applicant overcame the rejection with amendments and arguments focused on this limitation. *See* JA Ex. V at 3; Joint Br. at 34-35. It is also beyond dispute that Pautler disclosed a codebook with an index ("Configuration #") and associated data dictating the number of "data streams" that could be used to transmit. *See id.* The applicants narrowed their claims from "information on possible multiplicity associated with the number of spatial paths" to a "***value*** indicating" such multiplicity. JA Ex. J at 3 (emphasis added). In doing so, they acknowledged that Pautler's codebook included information on the number of spatial paths, but argued the information was not a "value." *Id.* at 6-7.[10] Thus, the disclaimer limits the form of the claimed "value" to something other than the codebook parameters of Pautler. Otherwise, the amendment could not have distinguished Pautler.

In contrast, Plaintiffs' construction is ambiguous and, based on their infringement contentions, apparently driven by a desire to pursue infringement based on a codebook ("MCS table") in the 802.11n standard that is identical to Pautler's for all relevant purposes. *E.g.*, JA Ex. DD at 11. To hide their intent to recapture claim scope, Plaintiffs state that their infringement "contention . . . relies solely on the 'MCS Index' values within the MCS table . . . not the entirety of the table." Joint Br. at 39. That argument confirms the need for Defendants' proposed limitation because, given the similarities between the MCS Index and Pautler's "Configuration #," Plaintiffs

[10] Plaintiffs' citation to JA Ex. P (Joint Br. at 38) is misleading because the argument, which relates to the '461 patent, did not accompany an amendment of "information" to "value" in the claims.

are essentially accusing the prior art codebook index that indicates a set of codebook parameters, such as the number of spatial signals, and is a defining characteristic of a codebook, such as Pautler's.

Furthermore, it is important to consider the context in which the term "value indicating possible multiplicity" appears in the claims, *i.e.*, as part of two distinct claim limitations: (1) "a storage unit which stores beforehand a value indicating possible multiplicity"; and (2) "a control unit which controls a processing of transmitting a value indicating possible multiplicity." JA Ex. A, cl. 1; JA Ex. B, cl. 1; JA Ex. C, cl. 4.[11] The claim language requires both that the claimed value (previously "information" during prosecution) be stored in advance and transmitted to another radio device. The disclaimer the applicants made during prosecution applied to both how the value is stored and how it is transmitted. Pautler taught storing in memory codebook 76 that includes multiple rows of combinations of transmission parameters including modulation, error correction encoding, and power allocation for each data stream, as well as a codebook index that corresponds to each combination of transmission parameters.[12] JA Ex. Q, 11:66-12:44. Pautler further taught transmitting the codebook index to a receiving device so it could cross-reference the codebook index to look up transmission parameters. *Id.*, 7:17-20. Pautler then taught that the codebook "Configuration #" value is used as part of a process of applying weights to an array antenna to direct a signal to a receiver, and further applying weights to transmit and receive multiple signals in a MIMO communications channel. *Id.*, 1:39-2:63. The Pautler codebook and "Configuration #" that the applicants disclaimed during prosecution are the same as the MCS table and MCS Index

[11] The claims of the '024 patent have similar limitations, except they use the term "information on the number of spatial signals" instead of "value indicating possible multiplicity."
[12] As prior art cited during prosecution, Pautler is intrinsic evidence. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005).

that Plaintiffs accuse and contend would be captured by their construction. The Court should reject Plaintiffs' attempt to recapture disclaimed claim scope.

### 5. "a predetermined timing"/ "predetermined timing" – Claims 1 and 4 of the '103 Patent; Claims 1 and 4 of the '115 Patent; Claims 1, 4 and 7 of the '851 Patent

| Plaintiffs' proposed construction | Defendants' proposed construction |
| --- | --- |
| a prescribed time or processing step | timing set in advance and not variable during operation |

#### a. Sisvel's Opening Position

Plaintiffs' construction is fully consistent with the prosecution history, whereas Defendants offer a disfavored "negative" construction that would improperly exclude embodiments otherwise naturally covered by the claim language.

The claims recite that the radio apparatus transmits the value indicating possible multiplicity to a second radio apparatus at a predetermined timing. The specification describes, at length, the algorithm and process of transmitting the value with each embodiment.

In connection with Fig. 3 (reproduced in relevant part to the right), the specification teaches that "the antenna number information is transmitted to the base station from terminal 1000 as control information in requesting establishment of a link channel (LCH allocation request)." (JA Ex. A at 9:62-65.) Fig. 3 depicts a "flowchart illustrating an operation for notifying base station CS1 of information on the number of antennas from terminal 1000," and makes clear that the transmission of the antenna number information (the value indicating possible multiplicity in this example) can occur during a prescribed step of the flowchart instead of at an invariable and

FIG.3



specific numerical time. (*Id.* at 7:31-33.) Other figures and embodiments in the specification reinforce this point, including Figure 7, which is reproduced below in relevant part:

FIG.7




In Figure 7, the transmission of the value indicating possible multiplicity (here, the number of antenna elements N or maximum number of paths P_MAX) occurs at a prescribed processing step S100 of the flowchart. (*Id.* at 12:30-32.)

Defendants cite background information in the specification relating generally to how signal components of time division multiple access (TDMA) or PDMA systems are divided into time "frames" and each frame is further divided into "slots." (*See id.* at 1:28-37; 3:2-4; 3:53-59.) It is undisputed that these prior art signal divisions are set to have predefined durations. But that is irrelevant. The claim term "predetermined timing" refers to ***when*** the signal containing a value indicating possible multiplicity is transmitted to a remote device, not how those signals are temporally divided. Defendants' cited background information does not address the relevant issue.

Defendants' remaining cited specification evidence supports Plaintiffs' construction. For example, Defendants' cite column 10, lines 18-25 of the'103 patent specification, which says:

> The timing of notification of the antenna number information [a value indicating possible multiplicity] . . . has been set at the time of request . . ., it may be at a control information stage during establishing the traffic channel (TCH), or alternatively, the antenna number information may be notified . . . as the control information after the traffic channel is established.

The "time of request," the "control information stage during establishing the traffic channel (TCH)," and "after the traffic channel is established" are all examples of prescribed processing steps.

The problem with Defendants' construction is that the absolute timing of these steps can vary during operation, depending on factors like channel and antenna conditions, even though their place within the broader processing workflow remains the same. (*See*, *e.g.*, *id.* at Figs. 3, 7, 8, 11, 12, 14, 15.) While Plaintiffs' construction includes these disclosed embodiments, Defendants' construction explicitly prohibits them, contrary to controlling case law. *See EPOS Technologies Ltd.*, 766 F.3d at 1347; *In re Katz Interactive Call Processing Patent Litigation*, 639 F.3d at 1324.

Defendants' cited prosecution history evidence similarly supports Plaintiffs' construction. During the prosecution of the parent '461 patent, the Examiner incorrectly interpreted the '461 patent's corollary to "predetermined timing" ("prescribed timing" in the '461 patent) to mean "at any time," and the applicant clarified that "'prescribed timing' indicates that specific time ***or pattern*** is defined."[13] (JA Ex. P at 3.) The applicants' statement explicitly contemplates non-absolute timing defined by "patterns," which is consistent with Plaintiffs' construction but would be excluded by Defendants' construction. Accordingly, Defendants' construction should be rejected, and Plaintiffs' construction adopted.

**b. Defendants' Answering Position**

The parties disagree about whether a "predetermined timing" is a time set in advance (Defendants) or instead means any known process step, even one with unpredictable and indeterminate timing (Plaintiffs). The specification supports Defendants' construction.

To begin, the claims on their face recite "a predetermined timing." The term "predetermined" means "settled, decided, or decreed beforehand." JA Ex. W. Defendants'

[13] Unless otherwise indicated, emphasis appearing within Plaintiffs' sections of the combined Brief has been added.

construction reflects that meaning while Plaintiffs fails to define the word "predetermined," replacing it with the word "prescribed" instead. The claims also say nothing of "processing steps," which Plaintiffs have nonetheless inserted into their construction.

Plaintiffs' construction also runs afoul of the specification. Although the phrase "predetermined timing" does not appear in the specification, it does describe transmitting values at a "prescribed timing." JA Ex. A, 4:34-5:2. As Plaintiffs acknowledge, during prosecution of a parent patent, the applicant defined "prescribed timing" to mean "specific time or pattern is defined." Joint Br. at 44. (emphasis omitted); JA Ex. P at 3-4. The specification tracks that definition, which mirrors Defendants' construction. For example, in the embodiment of Figure 3, a terminal sends antenna number information to the base station in an allocation request "at a prescribed timing." *Id.*, 9:46-49, 9:62-65. The timing of that notification is "set at the time of request of establishing the link channel" and initiates a messaging flow. *Id.*, 10:18-25. The timing is set because once the terminal determines it will send a request, the notification is sent without delay as the first step in the flow. The same is true for the messaging flows of Figures 7 (step S100), 8 (step S200), 11 (step S300), 12 (step S400), and 15 (step S600). *Id.*, 12:30-32, 13:32-35, 15:27-29, 15:54-56, 18:6-7. The specification explains the timing of the notification can be set to occur during other stages of communication as well, such as "at a control information stage during establishing the traffic channel" or "after

FIG.3



the traffic channel is established." *Id.*, 10:18-25. In all events, once a terminal decides to perform the messaging, the timing for sending information is set and will not vary.

The specification also provides examples of sending information using a control loop with a set timing for updates. As shown in Figure 7, a terminal may send a message to a base station at step S106 to request an increase in the number of spatial paths based on frame error rate or interference data. *Id.*, 12:35-52, 13:16-20. If the base station rejects the request, communication continues using the existing number of spatial paths for a "prescribed time period" (step S112) after which the terminal reevaluates communication quality (step S104) and sends another increase request if certain conditions are met (step S106). *Id.*, 12:58-63. The timing of the request to increase the number of spatial paths is set to repeat periodically. The messaging flow of Figure 8 is similar. *Id.*, 13:65-67.

FIG.7




The specification also discusses "prescribed" timing in the context of the TDMA scheme of PHS. In this scheme, a communication channel is broken down into 5 millisecond frames and each frame is broken down into four time slots of 625 microseconds "for transmission and reception." *Id.*, 1:28-33. In other words, communications have fixed length and timing. This is illustrated in Figure 20B, where users are allocated specific times for communication before the communications happen. *Id.*, 2:58-62. The specification further discloses allocating at least one

pair of time slots for use as a control channel for "establishing synchronization." *Id.*, 1:39-47. The control channel is used to establish communication between a terminal and a base station. *Id.*, 1:44-47, 1:54-64, Fig. 19. The time slots allocated for a control channel do not change. The embodiment disclosed in Figure 3 sends control information during the dedicated control channel described in Figure 19. *Id.*, 9:46-65 (Figure 3 describes the control procedure in a PHS system described in Figure 19). Defendants' construction reflects the specification's disclosure of transmitting control information at times that are set in advance and, therefore, not variable.

FIG.20B




Plaintiffs' construction, on the other hand, fails to reflect the teachings of the intrinsic record. Plaintiffs rewrite the claim language by replacing "predetermined" with "prescribed" and adding the words "processing step." That is not a reasonable construction because it does not explain what "predetermined timing" means and will not aid a jury in understanding the scope of the claim. Plaintiffs argue that any "prescribed step" is a "predetermined timing" even if the timing of that step is unpredictable. Joint Br. at 42-44. But Plaintiffs' construction and arguments ignore that the specification describes setting times for transmitting control information, as described above. As Plaintiffs admit, "'predetermined timing' refers to ***when*** the signal containing a value . . . is transmitted," not just the specific steps for doing so. *Id.* Although Plaintiffs assert that "establishment of the link channel," "at a control information stage during establishing the traffic channel," and "after the traffic channel is established" are "prescribed processing steps" (Joint Br. at 42-43), those are simply communication stages when

timing is set. Within each of these stages, the actual timing for the transfer of information is set in advance and not variable during operation, as demonstrated by the example of Figure 3.

Plaintiffs also argue that the Defendants' construction excludes embodiments because the "absolute timing" of process steps "can vary during operation, depending on factors like channel and antenna conditions," citing several figures without any explanation. *Id.* at 44. As noted above, the specification describes sending information at a set and invariable time, such as to initiate messaging without delay once a terminal decides to request link establishment or after a "prescribed time period" as part of a feedback loop. Defendants' construction captures this concept but does not require "absolute timing." Instead, Defendants' construction requires only that the time for sending information within a particular stage is set in advance and does not vary, which differs from an operation in which transmissions occur randomly or indeterminately.

Finally, Plaintiffs' argument that the TDMA timing only temporally divides signals is a red herring. TDMA defines how devices communicate, and the time slots are set before communication begins and known by all devices, such that all devices know when they can transmit on a given channel and for how long. JA Ex. A, 2:64-3:8.

**c. Sisvel's Reply Position**

Defendants' extrinsic definition of "predetermined" does not contradict Plaintiffs' construction. Indeed, a "*prescribed* time or processing step" is one that is "settled, decided, or decreed beforehand." (See JA Ex. W.) The specification and prosecution history repeatedly emphasize that a "predetermined" timing is one that is "prescribed." (*See* JA Ex. A at 9:47-49; 11:36-37; JA Ex. P at 3.) Similarly, a "timing" can refer to either an absolute time or a "pattern," both of which are explicitly covered by Plaintiffs' construction. (JA Ex. P at 3.) Indeed, Defendants acknowledge that a "timing" can refer to a "stage[] of communication." (Joint Br. at

46, citing JA Ex. A at 10:18-25.) Plaintiffs' construction is, thus, the most succinct description of the specification's disclosure.

The only dispute between the parties, thus, appears to be whether the "timing" can be "variable during operation." Defendants cite the flowchart in Figure 7 of the specification, but while Defendants characterize steps S104 and S106 as evidence of a "set timing," those steps imply just the opposite under Defendants' construction. For instance, the number of times step S104 repeats depends on whether the conditions in steps S104 and S108 are satisfied. Similarly, whether and ***when*** step S106 even executes depends on whether the conditional statement in S104 is satisfied. While the processing steps or execution stages of such steps are set in advance, the absolute time when the steps occur (if at all) vary during communication with each terminal. Defendants' own cited evidence, thus, supports Plaintiffs' construction.

**d. Defendants' Sur-Reply Position**

Plaintiffs continue their effort to broaden the scope of the claims by replacing the word "timing" with the broader phrase "time or processing step." There is no reason to depart from the actual claim language on this point. *See* Joint Br. at 44-47. In their Reply, Plaintiffs cite to the prosecution history, where the applicants defined "prescribed timing" to mean "specific time or pattern is defined." Joint Br. at 48-49. But Plaintiffs have failed to explain how a "pattern" and a "processing step" are the same. Plaintiffs then erroneously allege that "Defendants acknowledge that a 'timing' can refer to a 'stage[] of communication.'" *Id.* Defendants actually argued that, while a notification can occur at several different stages of communication, "once a terminal decides to perform the messaging, the timing for sending information is set and will not vary." Joint Br. at 46. Neither point supports Plaintiffs' attempt to redefine the word "timing."

Plaintiffs accurately characterize the other dispute as "whether the 'timing' can be variable during operation." Joint Br. at 49. It cannot. The "timing" is, by its own terms, "predetermined." The parties agree that "predetermined" means "settled, decided, or decreed beforehand." *See* Joint Br. at 44, 48-49. But only Defendants' construction—"timing set in advance and not variable during operation"—stays true to this definition. Simply put, something that is "settled, decided, or decreed beforehand" cannot also be "variable during operation." Plaintiffs' argument concerning Figure 7 is based on a misunderstanding of Defendants' position. As already noted, Defendants' construction does not require "absolute timing." Joint Br. at 48. It allows for variability in when the communication stages themselves occur. However, within a particular stage, an event that occurs at a "predetermined timing" must occur at a time that is set in advance. Otherwise, it would not be "predetermined."

**6. Defendants' Summary of U.S. Patent Nos. 7,369,878, 7,454,234, and 7,873,389[14]**

The '878, '234, and '389 patents also are based on the Personal Handyphone System and relate to the interaction of two known wireless techniques: PDMA and diversity reception. In a PDMA scheme, a base station directs signals to a terminal using beams (JA Ex. E, 1:36-51) [15] and a multi-antenna diversity reception terminal receives signals by selecting the antenna with the highest reception level as the reception antenna (*id.*, 1:64-2:2). These approaches can be problematic when used together because an interference signal may be stronger than a desired signal, leading the terminal to select the wrong reception

F I G. 2 7 B




[14] Plaintiffs object to the inclusion of this section as it is not contemplated by Paragraph 9 of this Court's Scheduling Order.
[15] The '878, '234, and '389 patents share a nearly identical specification. Defendants cite to the specification of the '878 patent, but the cited material also appears in the other patents.

antenna. *Id.*, 3:41-54, 4:6-14. Figure 27B shows interference (U) and desired (D) signals between base station 10 and terminals 50, 60. To resolve this issue, a base station instructs a terminal to use a "reception operation" adapted to a preferred "transmission operation." *Id.*, 4:25-31. The specification describes various reception operations, including selecting antennas for adaptive array reception, selecting the antenna with the strongest signal for diversity reception, or selecting a specific antenna, such as the one most recently used for transmission. *Id.*, 4:58-67, 15:24-47, 16:4-13. Every operation involves selecting antennas.

**7. "radio base station apparatus" – Claim 1 of the '878 Patent; Claim 1 of the '234 Patent**

| **Plaintiffs' proposed construction** | **Defendants' proposed construction** |
|---|---|
| Plain and ordinary meaning | a device that functions primarily to wirelessly communicate directly with a plurality of user terminals such as mobile handsets and the like |

**a. Sisvel's Opening Position**

Defendants' proposed construction is a litigation-driven attempt to manufacture a non-infringement argument. It is flatly inconsistent with a proposal made within an IPR petition filed by a number of the Defendants.

Specifically, as most of the Defendants explained in their Petition for *Inter Partes* Review of U.S. Patent No. 7,369,878 ("'878 IPR Petition"), "As of the earliest priority date of the '878 Patent, a POSITA would have known that, in the context of 'wireless local area networks' and cordless phones (such as the PHS system discussed in the Background of the '878 Patent), the term 'access point' was commonly used interchangeably with the term 'base station' and that the term 'station' was commonly used interchangeably with the term 'terminal.'" (JA Ex. S, '878 IPR Petition at 37; *see also* JA Ex. T, '878 IPR Petition Exhibit AR-1002, Expert Declaration of Kevin Negus for *Inter Partes* Review of U.S. Patent No. 7,369,878, at ¶¶ 340,

343, 417.)[16] Defendants further clarified that, "an access point (AP) is a [terminal] to which one or more other [terminals] can dynamically associate in a distributed system . . . ." (JA Ex. S, '878 IPR Petition at 24.)

Thus, when not seeking a claim construction intended to further their non-infringement positions, Defendants seem to agree with Plaintiffs that the claim term "radio base station apparatus" has a plain and ordinary meaning to persons of ordinary skill in the art: namely, a type of terminal device that could connect one or more other terminal devices to a wireless network. This plain and ordinary meaning of "radio base station apparatus" is reflected throughout the common specification of the '878, '234, and '389 patents.[17] (*See*, *e.g.*, JA Ex. E at 4:50-51; 6:12-14; 7:20-23; 8:58-60; 10:10-12; 10:18-21; 11:52-56.)

In contrast, Defendants' proposed litigation construction is improperly restrictive and not supported by the intrinsic evidence. Nowhere in the specification is the claimed "radio base station apparatus" described in terms of its "primary" functionality. Further, the claimed "radio base station apparatus" is described throughout the specification in terms of its ability to communicate with a ***single*** terminal apparatus—there is no requirement that the claimed base station "primarily . . . communicate directly with a plurality of user terminals." (*See, e.g.*, *id.* at 4:50-51 ("one aspect of the present invention is a radio base station apparatus to which ***a radio terminal apparatus*** can connect . . ."); 6:12-14 ("The radio base station apparatus includes reception means for accepting a connection request from ***the radio terminal apparatus*** . . .");

---

[16] Defendants Lenovo Holding Company, Inc., and Lenovo (United States) Inc. are not named as real parties-in-interest in the '878 IPR Petition.

[17] Because the '878, '234, and '389 patents share a common specification, all specification citations for these patents are to the '878 patent specification (Exhibit E), in column:line format. Plaintiffs incorporate by reference the corresponding disclosures of the '234 and '389 patent specifications.

7:20-23 ("Still another aspect of the present invention is a reception operation control program for controlling, in a radio base station apparatus to which ***a radio terminal apparatus can connect*** . . ."); 8:58-60 ("Still another aspect of the present invention is a radio base station apparatus to which ***a radio terminal apparatus can connect*** . . ."); 10:10-12 ("Still another aspect of the present invention is ***a radio terminal apparatus*** that can connect to a radio base station apparatus . . ."); 11:52-56 ("Still another aspect of the present invention is a reception operation control program for controlling, in a radio base station apparatus to which ***a radio terminal apparatus*** can connect, a reception operation of a radio terminal apparatus that is to connect to the radio base station apparatus . . ."); claim 1 ("A radio base station apparatus for transmitting a frame to a radio terminal apparatus, the radio base station apparatus comprising: a receiver for receiving a connection request from ***the radio terminal apparatus*** . . .").

Adding extraneous limitations such as those Defendants propose is disfavored. *See Amgen Inc.*, 314 F.3d at 1325 *citing Hoganas AB*, 9 F.3d at 950. Moreover, Defendants' proposed construction effectively excludes disclosed embodiments, which is "rarely, if ever correct." *EPOS Technologies Ltd.*, 766 F.3d at 1347; *see also In re Katz Interactive Call Processing Patent Litigation*, 639 F.3d at 1324.

Defendants' construction should therefore be rejected, and, to the extent the Court believes the term "radio base station apparatus" requires construction, this term should be construed to have its plain and ordinary meaning.

**b. Defendants' Answering Position**

The parties disagree whether the claimed "radio base station apparatus" is broad enough to encompass a mobile terminal. According to Plaintiffs, the term includes "a type of terminal device that could connect one or more other terminal devices to a wireless network." Joint Br. at

52. But the claims and the specification describe a "radio base station apparatus" as different and distinct from a mobile terminal. Defendants' construction reflects that distinction.

The claims expressly distinguish between two wireless device types: a "radio base station apparatus" and a "radio terminal apparatus." Each device performs its own separate set of functions. As recited in claim 1 of the '878 patent, for example, a base station specifies a "reception operation" that a terminal must use when receiving communications from the base station. That operation is adapted to a corresponding "transmission operation" used by the base station. The specification likewise distinguishes between a base station and a terminal. The specification introduces "radio terminal apparatuses (terminals)" in the context of a cordless phone system—PHS. JA Ex. E, 1:36-44. A base station must be capable of communicating with multiple mobile terminals: "radio terminal apparatuses (terminals) of a plurality of users can be connected to a radio base station apparatus (base station)." *Id.*, 1:36-44. For example, Figure 27A shows a plurality of mobile terminals—terminals 30, 40 (blue)—connected to a single base station—base station 10 (red). *Id.*, 3:4-11, 25:58-63. According to the claims and the specification, a mobile terminal is not a base station. And as Plaintiffs recognize, the other asserted patents similarly describe a terminal as different from a base station. Joint Br. at 5-6, 8, 21-22, 42, 80.

F I G. 2 7 A




Plaintiffs' construction contradicts the claims and the specification by equating a mobile terminal and a base station. Although Plaintiffs cite parts of the specification for support (*id.* at 52), the cited passages undercut Plaintiffs' position because they distinguish between terminals and base stations by describing a "terminal" that connects to a "base station." None of the cited

passages says that a terminal is a base station or that a base station is a terminal. As described above, the claims and the specification uniformly treat the two devices as distinct, including by using different terms to describe them. If the two devices were the same, as Plaintiffs argue, the claims and specification would not have treated them separately and used different language to describe them.

Plaintiffs also argue that Defendants' construction excludes an embodiment described in the specification where a base station communicates with a single mobile terminal. *Id.* at 53-54. That argument misinterprets the specification and Defendants' construction. Plaintiffs cite passages that describe a connection between a base station and one particular terminal (among other possible terminals) to explain how an exemplary connection works. The specification does not say, however, that the base station is connected to one and only one terminal; the base station may be connected to other terminals. Moreover, Defendants' construction does not suggest that a base station ceases to be a base station when it is connected to just one terminal. While the construction states that a base station functions to connect to a plurality of mobile terminals—a capability identified in the specification (JA Ex. E, 1:36-44)—it also allows enough flexibility that a base station could connect to just one terminal.

In addition, Plaintiffs argue that an IPR petition filed by some Defendants contradicts Defendants' construction and supports Plaintiffs'. Joint Br. at 51-52. Not so. The petition cites the 802.11-1999 standard, which refers to "stations" (STA) in describing how a wireless system conforming to the standard can be set up. JA Ex. S at 24. The petition then observes that, at the time of the alleged invention, the term "access point" was used interchangeably with "base station" and the term "station" was used interchangeably with "terminal." *Id.* at 37. From there,

Plaintiffs pretend that the IPR petition shows Defendants agreeing that "STA [station]" means the terms "a terminal" and "a base station" are interchangeable.

Plaintiffs' pretense is both illogical and unsupported. The 802.11-1999 standard specially defines a "station" as a device having interfaces compliant with the standard. *Id.* at 37. A terminal with the specified interfaces might be a generic "station" under the 802.11-1999 standard, but that does not make it a "base station" capable of communicating with multiple mobile terminals as recited in the claims of the asserted patents. Plaintiffs' contortions aside, the IPR petition simply does not say that a terminal is a "base station."

**c. Sisvel's Reply Position**

Defendants mischaracterize the parties' dispute as "whether the claimed 'radio base station apparatus' is broad enough to encompass a mobile terminal." (Joint Br. at 53.) The questions for the Court are instead (1) whether the claim term "radio base station apparatus" requires construction, and (2) if so, what is the appropriate construction of this term?

Regarding the first question, Defendants publicly admitted that a POSITA would have understood the meaning of "radio base station apparatus." (*See* Joint Br. at 52-53, citing Exs. S, at 37-38, and JA Ex. T at ¶¶ 340, 343, 417.) Plaintiffs agree that a POSITA would have understood the meaning of this term. Therefore, the Court need not construe "radio base station apparatus." *See Invitrogen Corp. v. Clontech Laboratories, Inc.*, 429 F.3d 1052, 1076, 1078 (Fed. Cir. 2005) ("Claim construction requires the court to determine the meaning of disputed claim terms to one of ordinary skill in the art at the time of the invention.").

If the Court does decide to construe "radio base station apparatus," however, this term should be construed in light of its plain and ordinary meaning, as the term is used throughout the claims and specification: a type of device that can connect one or more other terminal devices to

a wireless network. (Joint Br. at 51-52.) In the specification, "radio base station apparatus" is not restricted to any specific "primary functionality" as Defendants suggest. (*Id.* at 49.) Indeed, the specification distinguishes between "radio base station apparatus" and "radio terminal apparatus" by describing only certain functionality of each device in relation to the other—with the user device seeking connection to a wireless network being the "terminal," and the device facilitating the connection being the "base station." (*See, e.g.*, JA Ex. E at 4:50-51; 6:12-14; 7:20-23; 8:58-60; 10:10-12; 10:18-21; 11:52-56.)

At no point did Plaintiffs argue that the terms "terminal" and "base station" are the same or interchangeable. (*See* Joint Br. at 55-56.) Plaintiffs quoted Defendants' IPR petition as saying that "the term 'access point' was commonly used interchangeably with the term 'base station' and that the term 'station' [not 'base station'] was commonly used interchangeably with the term 'terminal.'" (Joint Br. at 51-52, citing Exs. S and T.) If Defendants intended that quote to mean that "base station" and "terminal" are the same, Plaintiffs disagree.

Plaintiffs did cite multiple examples throughout the specification that describe base stations ***only*** in terms of the base station's ability to connect ***a single terminal*** to a wireless network. (*See* Joint Br. at 52-53, citing JA Ex. E at 4:50-51; 6:12-14; 7:20-23; 8:58-60; 10:10-12; 10:18-21; 11:52-56.) The claims similarly recite "a radio base station apparatus ***for transmitting . . . to a radio terminal apparatus***" (singular terminal). (***See, e.g.***, JA Ex. E, claim 1 (emphasis added).) The cited examples and claim language thus contemplate an interaction between a base station and ***a single terminal***.

A device capable of connecting only one terminal to a wireless network at a time, but otherwise meeting the remaining claim limitations, would still fall within the scope of the above examples and claim language. Defendants' construction, however, would exclude such devices

because they do not "function[] primarily to wirelessly communicate directly with a plurality of user terminals." Adding the extraneous limitations Defendants propose is therefore improper. *See Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1325 (citing *Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, 950).

Defendants' construction should therefore be rejected in favor of adopting the plain and ordinary meaning of "radio base station apparatus."

**d. Defendants' Sur-Reply Position**

Plaintiffs adopt a muddled position on this term, demonstrating the need for the Court to construe it. For example, Plaintiffs accuse Defendants of mischaracterizing the parties' dispute as whether "'radio base station apparatus' is broad enough to encompass a mobile terminal." Joint Br. at 56-57. Yet, Plaintiffs take the position that a base station is a mobile terminal, making clear that the parties dispute that point. Specifically, Plaintiffs refer to the radio base station apparatus as a device that can connect "one or more <u>*other*</u> terminal devices" to a network, implying that the base station itself also is a terminal. *Id.* (emphasis added).

Defendants' construction describes base stations and terminals as separate devices and reflects the intrinsic record, while Plaintiffs' interpretation equating the two devices lacks support. The specification describes a "radio base station apparatus" and a "radio terminal apparatus" as different devices. Joint Br. at 54. The claims also use the terms to refer to separate devices. *E.g.*, JA Ex. E, cl. 1. The dichotomy created by the claim language would make no sense if, as Plaintiffs contend, terminals were base stations or vice versa. Plaintiffs attempt to sweep away the difference between base stations and mobile terminals by arguing that the two devices differ only in terms of functionality, with mobile terminals "seeking connection to a wireless network" and base stations "facilitating the connection." Joint Br. at 57. While Plaintiffs cite the patent specification, none

of the cited passages makes the distinction Plaintiffs advocate. Instead, the excerpts simply describe that a mobile terminal can connect to a base station. The specification does not teach that the same device toggles between being a base station and mobile terminal depending on its operation, as Plaintiffs suggest. Plaintiffs have had two chances to identify any disclosure supporting their position and have provided none.

Plaintiffs also incorrectly assert that an IPR petition filed by some Defendants concedes that "radio base station apparatus" need not be construed. *Id.* at 56 (citing JA Ex. S at 37-38). Not so. The IPR petition, which is governed by a different claim construction standard, does not propose a construction because the petitioners did not believe a construction was needed to resolve the invalidity dispute at issue in the IPR. JA Ex. S at 37-38. Moreover, the petition does not state generally that a base station is a terminal, let alone suggest any meaning for "radio base station apparatus" based on the specific context of the relevant patents.

Plaintiffs also repeat their assertion that Defendants' construction would exclude base stations that connect to a single terminal. Joint Br. at 57-58. That argument fails for at least two reasons discussed in Defendants' Answering Position (Joint Br. at 54-55).

In sum, Defendants honor the differences between base stations and mobile terminals with an easy-to-understand explanation of what a base station is; Plaintiffs attempt to obfuscate.

**8. "reception operation [adapted to a transmission operation]" – Claim 1 of the '878 Patent; Claim 1 of the '234 Patent; and Claim 1 of the '389 Patent**

| Plaintiffs' proposed construction | Defendant Lenovo's proposed construction |
|---|---|
| An operation of the receiving radio terminal apparatus adapted in response to the signal / single bit transmitted from the radio base station apparatus | a technique for selecting one or more antennas to receive a frame[18] |

[18] This construction is proposed only by Defendant Lenovo.

**a. Sisvel's Opening Position**

Here Defendant Lenovo proposes a narrowing construction that even other Defendants fail to advocate. In contrast, Plaintiffs' construction faithfully accommodates the full intrinsic record.

The term "reception operation," as used in the claims, is limited only insofar as it must be adapted to "a transmission operation of the radio base station apparatus." Non-limiting examples of the claimed "reception operation" in the specification include adaptive array reception and transmission (JA Ex. E at Figs. 16-17, 22-23), diversity reception operation (*id.* at Figs. 15-17, 22-23), and performing a reception operation with a single, previously selected antenna (*id.* at 6:61-65, 8:3-8, 8:29-34). Plaintiffs proposed construction encompasses all these embodiments.

Defendant Lenovo, by contrast, seeks to impermissibly limit "reception operation" to only those embodiments involving antenna selection. *See Phillips*, 413 F.3d at 1320 (noting that it is a "cardinal sin" to read a limitation from a specific embodiment into the claims). In fact, the specification expressly describes embodiments that perform the claimed "reception operation" with a single antenna that has already been selected for transmission and reception. (*See*, *e.g.*, JA Ex. E at Figs. 5-7; 6:61-65 ("Preferably, the radio terminal apparatus is a radio terminal apparatus performing transmission and reception with one antenna, ***and the reception operation control means perform a reception operation with the one antenna in response to the signal indicating the diversity reception operation***.").)

Given that antenna selection is described separately from the claimed reception operation in these embodiments, the claimed reception operation cannot, consistent with the specification, be limited to merely antenna selection as Lenovo proposes. Such a limitation would

impermissibly exclude disclosed embodiments. *See EPOS Technologies Ltd.*, 766 F.3d at 1347; *see also In re Katz Interactive Call Processing Patent Litigation*, 639 F.3d at 1324.

Defendants' construction should therefore be rejected, and Plaintiffs' construction should be adopted.

**b. Defendants' Answering Position**

For this term, the parties dispute whether the claimed "reception operation" is limited to techniques for selecting antennas that receive a frame (as in Lenovo's construction) or refers to any "operation of the receiving radio terminal apparatus adapted in response" to a signal received from a base station (as in Plaintiffs' construction).

The claims and specification support Lenovo's construction. On their face, the claims require more than just any operation performed at a receiving device; they require a "reception operation" indicated by the base station that is "adapted to a transmission operation." The specification sheds light on the meaning of "reception operation," describing it as a technique for selecting an antenna or antennas to receive a signal sent by a base station. Reception operations include an "adaptive array reception operation" and a "diversity reception operation." *E.g.*, JA Ex. E, 4:58-67. In the adaptive array reception operation, antennas are selected to receive a signal with "reception directivity" to avoid potential interference. *Id.*, 1:45-51, 16:14-16. In the diversity reception operation, the antenna with the highest reception level is selected as the reception antenna. *Id.*, 1:66-2:2, 15:37-48. In other instances, a terminal having one antenna selects that antenna to receive. *Id.*, 6:61-65, 8:3-8, 8:29-34, 21:38-45. In another example, a terminal selects as the reception antenna, the antenna it just used to transmit to the base station. *Id.*, 15:36-61. In all cases, the reception operation indicated by the base station determines which antenna or antennas a terminal will use to receive frames from the base station. *Id.*, 15:24-

30, 20:1-4, 21:1-4, 22:23-35. Defendants' construction reflects these disclosures.

Plaintiffs' criticisms do not withstand scrutiny. First, Plaintiffs assert that Defendants other than Lenovo are not advocating for the construction. Joint Br. at 60. To be clear, the non-Lenovo Defendants do not agree with Plaintiffs' construction, which is inconsistent with the plain language of the claims and the specification, and would accept Lenovo's construction if this term is construed.

Second, Plaintiffs argue that Lenovo's construction imports limitations from the specification into the claims and excludes embodiments of terminals that have only one antenna. *Id.* at 60-61. That argument is wrong because it rests on the false premise that the single-antenna examples in the specification do not perform a reception operation. To the contrary, the specification expressly states that each example of a single-antenna terminal uses its lone antenna to perform a reception operation "in response to the signal indicating the [diversity/adaptive array] reception operation." JA Ex. E, 6:61-65, 8:3-8, 8:29-34. When the base station knows beforehand that a terminal is a "one antenna terminal, . . . it generates a signal that indicates to fix the one antenna as the reception antenna . . . ." *Id.*, 24:57-61. If the base station does not know the number of terminal antennas, it may indicate a reception operation impossible for a single-antenna terminal so that terminal "performs the reception operation that is fixed to that one antenna." *Id.*, 21:38-54. In each case, after receiving the signal from the base station, the terminal selects its only antenna to receive. Lenovo's construction covers all embodiments because each involves selecting one or more antennas for receiving.

Plaintiffs also argue that a "reception operation" could be any receiving device operation adapted to a transmission operation. Joint Br. at 60. But Plaintiffs cite no support in the specification for that overly broad interpretation. To the contrary, as explained above, the

specification uniformly teaches reception operations that involve selecting antennas. *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1374-76 (Fed. Cir. 2009) (affirming construction requiring a spike to be pointed where the specification "repeatedly and uniformly" described a pointed spike and "never suggest[ed] that a spike can be anything other than pointed"). By contrast, Plaintiffs' open-ended construction "would likely render the claims invalid for lack of written description." *Ruckus Wireless, Inc. v. Innovative Wireless Sols.*, LLC, 824 F.3d 999, 1003-04 (Fed. Cir. 2016) (affirming construction of "communications path" that excluded wireless communications as the specification described only wired communications).

**c. Sisvel's Reply Position**

Lenovo's construction is improperly restrictive, even in light of Lenovo's own cited evidence. Plaintiffs and Lenovo agree that "adaptive array reception" is an example of a "reception operation" that can qualify as "a reception operation adapted to a transmission operation of the radio base station apparatus." (*See* Joint Br. at 60; Joint Br. at 61.) Lenovo's construction, however, is too narrow to encompass this concept because adaptive array reception involves significantly more than mere antenna selection. (JA Ex. E,1:45-49 ("an adaptive array technique is currently employed, in which an uplink signal from each user's terminal antenna is received by an array antenna of a base station ***and extracted with reception directivity through an adaptive array process.***") (JA Ex. E,1:45-49 (emphasis added).) Indeed, the specification suggests that at least the relative "weight" ascribed to each antenna in an adaptive array and the "reception directivity" of those antennas are key aspects of adaptive array reception, neither of which are accounted for by Lenovo's construction. (*See*, *e.g.*, JA Ex. E, 16:14-16; 18:25-34.) Plaintiffs' construction, by contrast, fully accounts for this concept.

Further, that Lenovo's construction "covers" one common feature of all disclosed embodiments (Joint Br. at 62-63) does not mean that the construction encompasses the full, relevant scope of those embodiments (or the disputed claim term). *See C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 865 (Fed. Cir. 2004) ("[A] patent claim term is not limited merely because the embodiments in the specification all contain a particular feature.") Lenovo's construction excludes at least the preferred "adaptive array reception" approach, among others.

Lenovo also conflates "fixing" the lone antenna for reception with "selecting" that antenna for reception. (Joint Br. at 62.) When a terminal chooses between multiple reception antennas, the specification refers to this as "selection." (*See*, *e.g.*, JA Ex. E at Figs. 10, 19, 15:36-48; 20:25-27.) But when a terminal has only one antenna—and therefore no antennas to "select" between—the specification refers to "fixing" that one antenna for reception. (*See*, *e.g.*, JA Ex. E at Figs. 22, 23, 25, 9:63-10:9; 11:4-8, 21:38-54.) The specification thus differentiates between antenna "selection" and antenna "fixation." Lenovo cannot now fit single antenna "fixing" into the scope of its proposed construction without running afoul of the disclosure in the specification.

Moreover, the claimed "reception operation" must be "adapted to a transmission operation of the radio base station apparatus." To receive a signal from the radio base station apparatus in the first place, the single antenna of the terminal apparatus necessarily must have already been set to receive. Thus, the "selection" of that antenna, even under Lenovo's strained usage of that word, could not have been performed ***in response to*** receiving a signal from the claimed base station apparatus as the claims require.

For all the above reasons, and for those set forth in Plaintiffs' Opening Brief, Lenovo's construction should be rejected, and Plaintiffs' construction adopted.

**d. Defendants' Sur-Reply Position**

Lenovo previously explained that "reception operation" refers to techniques for selecting reception antennas and challenged Plaintiffs to identify support in the specification for their broad construction capturing any "operation of [a] receiving radio terminal apparatus adapted in response" to a base station signal. Joint Br. at 61-63. Plaintiffs were unable to do so.

Plaintiffs argue that one exemplary reception operation described in the specification—"adaptive array reception"—requires more than selecting antennas for reception and is thus excluded from Lenovo's construction. *Id.* at 63. That is incorrect. The specification describes "adaptive array reception" as using a plurality of antennas for receiving a signal. JA Ex. E, 16:4-8, 20:55-59, 22:19-22. Plaintiffs nonetheless insist that "adaptive array reception" requires extracting signals with reception directivity. Joint Br. at 63. The passage from the specification cited by Plaintiffs teaches the opposite. The passage describes "an adaptive array technique . . . in which an uplink signal from each user's terminal antenna is received . . . and extracted with reception directivity." JA Ex. E, 1:45-49. Extraction is a separate action that occurs after "adaptive array reception," *i.e.*, receiving base station signals. Indeed, the specification refers to the later processing as an "adaptive array process," not "adaptive array reception." "Adaptive array reception" simply requires selecting reception antennas and is consistent with Lenovo's construction.

Plaintiffs also resort to semantics to argue that single-antenna terminal embodiments are excluded from Lenovo's construction. Plaintiffs argue that the specification describes choosing a reception antenna in single-antenna embodiments as "fixing," not "selecting" (the word used in Lenovo's construction). Joint Br. at 64. But the specification uses "select" and "fix" interchangeably, gutting Plaintiffs' argument. Sometimes the specification uses "select" to

describe choosing a reception antenna. JA Ex. E, 1:66-2:2 ("a terminal operates to select one antenna with higher reception level as a reception antenna from, for example, two antennas"); *see also id.*, 3:41-54, 15:36-47, 19:48-49, 20:34-38. Elsewhere, the specification uses "fix" to mean the same thing. *Id.*, 24:62-67 ("a signal that indicates to fix a specific antenna of the terminal as the reception antenna"); *see also id.*, 22:65-23:3, 24:57-61, 25:29-33. Thus, "fixing" a single antenna as the reception antenna is the same as "selecting" it for that purpose.

Plaintiffs further argue that selecting the reception antenna in a single-antenna terminal occurs before a base station transmits to the terminal and therefore cannot be "adapted to a transmission operation of the radio base station apparatus" as required in the claims. Joint Br. at 64. Plaintiffs appear to be making a second argument that Lenovo's construction excludes single-antenna terminals. But Plaintiffs err in describing antenna selection in a single-antenna terminal. The specification describes selecting the reception antenna in a single-antenna terminal after the base station specifies a reception operation to a terminal, just as required by the claims. JA Ex. E, 24:24-32, 24:57-61, 25:7-12, 25:25-28. Lenovo's construction is consistent with that disclosure and encompasses single-antenna terminals.

Plaintiffs' arguments do not support construing "reception operation" more broadly than the specification's disclosure of selecting reception antennas (*e.g.*, *id.*, 19:61-20:4, Fig. 10), as reflected in Lenovo's construction. Plaintiffs dismiss that construction as merely covering a feature common to all embodiments (Joint Br. at 64), but that description is incomplete. While the specification describes selecting one or more antennas in every embodiment, it provides no disclosure to support that "reception operation" can mean anything else. Joint Br. at 62-63.

**9. Defendants' Summary of U.S. Patent No. 8,737,377**[19]

The '377 patent describes mitigating some consequences of using cyclic delay to combat unintended beamforming (signal directivity) for beacons. Beamforming results from a base station transmitting identical signals from multiple antennas with little or no time delay. JA Ex. I, 4:1-6. Beamforming can be undesirable when it prevents beacon signals, which generally announce wireless system capabilities, from being "received by as many terminal apparatuses as possible." *Id.*, 4:8-10. Using cyclic delay when transmitting beacon signals can avoid beamforming. *Id.*, 3:56-67. But as the specification describes, increasing cyclic delay can have drawbacks, such as decreasing correlation between channel coefficients, which may cause communication errors. *Id.*, 4:15-18. The potential for communication errors may increase if a receiving terminal uses "smoothing" to reduce noise because smoothing presumes a high degree of correlation. *Id.*, 4:18-26. To address this issue, the '377 patent proposes a signaling scheme in which a base station adds control information to beacon signals to instruct the terminal with respect to smoothing.

**10. "generation unit"/ "generation unit [configured to generate / generates] a packet signal. . ."; ('377 patent, Claims 1 to 4)**

| Agreed Portion of Construction |
|---|
| The construction of this term is subject to pre-AIA 35 U.S.C. § 112 ¶ 6.<br><br>Functions:<br><br>1) generating a packet signal including a plurality of CDD-applied streams;<br><br>2) including in the packet signal information permitting smoothing if an amount of CDD is less than a [threshold value defined for time/predetermined time amount] and including in the packet signal information prohibiting smoothing if the amount of CDD is greater than or equal to the [threshold value defined for time/predetermined time amount]; and |

[19] Plaintiffs object to the inclusion of this section as it is not contemplated by Paragraph 9 of this Court's Scheduling Order.

| |
|---|
| 3) generating a packet signal in which a L-STF, L-LTF, L-SIG, HT-SIG, HT-STF, and HT-LTF, and data are assigned in the stated order and the information is included in the HT-SIG field. |

| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
|---|---|
| Corresponding structure:<br><br>The corresponding structure for this claim term includes a baseband processing unit and a controller programmed to (i) control the timing of the transmitting apparatus, (ii) control the generation of a packet signal by the baseband unit, and (iii) insert information, which indicates performance or prohibition of a smoothing processing of channel coefficients across subcarriers, based on the amount of CDD shift, as set forth in Figures 2, 3A-3C, 4, 6, 7 and the text at 2:38-55, 5:38-6:4, 6:37-51, 6:66-7:30, 7:40-50, 8:6-15, 8:33-9:14, 9:24-34, 10:30-11:14, and 11:21-31; and equivalents of the foregoing.<br><br>Plaintiffs further contend that it is premature for the Court to address Defendants' indefiniteness arguments at the claim construction stage. | Corresponding structure:<br><br>Indefinite because the specification does not clearly link structure to the claimed functions.<br><br>Alternatively, the corresponding structure includes at least a baseband processing unit and a controller programmed to compare (i) the amount of CDD to be applied to a beacon having the claimed packet format to (ii) a [threshold / predetermined time amount], and set the information based on the result of the comparison. |

**a. Sisvel's Opening Position**

The parties agree that pre-AIA 35 U.S.C. § 112 ¶ 6 applies to the claim term "generation unit" / "generation unit [configured to generate / generates] a packet signal . . .," and that the functions of the claimed generation unit include:

1) generating a packet signal including a plurality of CDD-applied streams;

2) including in the packet signal information permitting smoothing if an amount of CDD is less than a [threshold value defined for time/predetermined time amount] and including in the packet signal information prohibiting smoothing

if the amount of CDD is greater than or equal to the [threshold value defined for time/predetermined time amount]; and

3) generating a packet signal in which a L-STF, L-LTF, L-SIG, HT-SIG, HT-STF, and HT-LTF, and data are assigned in the stated order and the information is included in the HT-SIG field.

The parties further agree that the corresponding structure of a generation unit includes a baseband processing unit and a controller.[20] (*See* JA Ex. I at Fig. 4; 7:18-23; 7:40-50.)

The only remaining point of dispute concerns the particular operation of the "controller." Plaintiffs' proposal includes all of the relevant features from the specification, while Defendants' does not.

When claimed subject matter generally includes a series of computer-implemented steps, the corresponding structure is typically the algorithm for carrying out the claimed function. *See, e.g.*, *Aristocrat Techs. Australia PTY Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008). Because the dispute regarding the "controller" relates to the algorithms the "controller" executes, the arguments below are framed in terms of the functionality of those algorithms rather than in terms of a physical structure.

The specification of the '377 patent teaches that the controller: (1) "controls the timing and the like of the first radio apparatus 10a" (*id.* at Fig. 4); (2) "control[s] . . . the generation of beacons" by, for instance, directing the baseband unit to "produce beacons by varying the shift amounts that corresponds respectively to a plurality of antennas 12" (*id.* at 8:33-35; 8:44-47); (3) inserts in the packet signal "a first part in which CDD is performed with a fixed shift amount . . .

[20] The specification uses the term "control unit." As used in Section II.7, the terms "controller" and "control unit" are used interchangeably.

and a second part in which CDD is performed by switching the shift amounts" (*id.* at 8:55-59); or (4) "controls that information, which indicates permission to perform a smoothing processing of channel coefficients across subcarriers . . . is inserted" in the packet signal when a first CDD shift amount is used, and "controls that information, which indicates to prohibit to perform a smoothing processing of channel coefficients across subcarriers . . . is inserted" in the packet signal when a second CDD shift amount is used. (*Id.* at 8:61-9:14.)

These various operations are described in the specification at Figures 2, 3A-3C, 4, 6, 7 and the text at 2:38-55, 5:38-6:4, 6:37-51, 6:66-7:30, 7:40-50, 8:6-15, 8:33-9:14, 9:24-34, 10:30-11:14, and 11:21-31. Plaintiffs' proposal accounts for all the above functionality.

Defendants' proposal, however, is overly narrow because it limits the controller to one that merely "compare[s] the amount of CDD to be applied . . . to a [threshold/predetermined time amount] and set[s] the information based on the result of the comparison." Defendants' proposal paraphrases claim language in light of select specification excerpts, but it reads out key functionality of the controller, including controlling the generation of beacons by the baseband unit, and inserting the appropriate information permitting or prohibiting smoothing into the packet signal. Because constructions, like Defendants', that exclude disclosed embodiments are "rarely, if ever correct," *see EPOS Technologies Ltd.*, 766 F.3d at 1347, Defendants' proposed structure should be rejected and Plaintiffs' structure adopted.

Defendants argue, in the alternative, that the term is indefinite. However, a claim term that falls within the scope of § 112 ¶ 6 as a means-plus-function term is not indefinite unless the specification fails to recite sufficient structure for performing the recited function. *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015). The parties already agree as to substantial portions of the proposed structure corresponding to the claimed functions. While the

parties disagree on the specificity of the algorithm executed by the controller, it is undisputed that the combination of the baseband unit and controller performs each of the three claimed functions.

The specification provides ample support for this underlying structure. For example, the baseband processing unit "converts the frequency-domain signals into time domain and then outputs the thus converted signals as time-domain signals by associating them respectively with a plurality of antennas." (JA Ex. I at 7:18-23.) A signal outputted by a plurality of antennas is precisely in the format described by Fig. 3A—L-STF, L-LTF, L-SIG, HT-SIG, HT-STF, HT-LTF, and data are assigned in the stated order. (*See id.* at 5:46-49) ("FIG. 3A shows a packet format of beacon conveyed from the antennas 12. It is assumed herein that beacon is conveyed and informed from the first antenna 12 a and the second antenna 12 b.") Furthermore, the controller and baseband processing unit generate a packet signal by defining, for each antenna, the CDD within a cycle in the time domain, (*id.* at 8:35-39), "perform[ing] CDD to generate beacons," and "extend[ing] the degree of inputted data to the number of multiple streams." (*Id.* at 7:48-50.) Finally, as set forth above, the controller inserts, in the L-SIG or HT-SIG fields of the packet signal, information permitting or prohibiting smoothing based on the amount of CDD shift. (*Id.* at 8:65-66; 9:9-10.)

All of the above description is included within Plaintiffs' proposed construction. Because the intrinsic evidence clearly links the described structure to the claimed functions of the generation unit, a POSITA would understand "generation unit" to have a sufficiently definite structure and the term is not indefinite. *See Triplay, Inc. v. Whatsapp, Inc.*, No. 13-1703-LPS-CJB, 2016 U.S. Dist. LEXIS 157680, at *6-*9 (D. Del. Nov. 15, 2016). Defendants' attempted

sleight of hand— arguing that the term is both indefinite or, "alternatively," supported by a definite structure— should be rejected.

**b. Defendants' Answering Position**

The parties agree that the "generation unit" is functionally claimed, triggering 35 U.S.C. § 112, para. 6, and that the corresponding structure must perform three agreed functions. The parties only dispute whether the specification discloses sufficient corresponding structure and, if so, the nature of that structure.

FIG.7




The '377 patent describes a beacon generation process, wherein a transmitter alternately outputs successive beacons that include a first, shorter amount of cyclic delay (CDD) (*e.g.*, 50 nanoseconds) and a second, longer amount of CDD (*e.g.*, 400 nanoseconds). JA Ex. I, 8:48-9:13, 10:35-44, Fig. 7; JA Ex. AA ¶¶ 34, 52. The process is carried out in part by a "baseband processing unit" (baseband unit) that receives beacons having the packet format shown in Figure 3B, which it then extends to form multiple streams. JA Ex. I, 7:40-50; JA Ex. AA ¶¶ 43-45. The baseband unit adds a shift, or delay amount, to each stream. JA Ex. I, 8:6-15; JA Ex. AA ¶¶43-45. A "control unit" controls whether the baseband unit applies a first, shorter delay or a second, longer delay, depending on whether the previous beacon included long or short delay, respectively, as shown in Figure 7. JA Ex. I, 8:33-60, 10:35-44, Fig. 7; JA Ex. AA ¶ 52. If the previous beacon included a short delay, the control unit causes the baseband unit to insert a long delay and vice versa. *Id.* The control unit also controls the information that is inserted in the beacon to permit a receiver to perform

smoothing of packets that include the first delay and prohibit a receiver from performing smoothing of packets that include the second delay. JA Ex. I, 8:61-9:13; JA Ex. AA ¶¶ 49, 52.

i. <u>The specification lacks sufficient structure</u>

The parties agree that the claims require the generation unit to include in the packet signal information permitting smoothing if an amount of CDD is less than a [threshold defined for time/predetermined time amount] and include in the packet signal information prohibiting smoothing if the amount of CDD is greater than or equal to the [threshold value defined for time/predetermined time amount], among other functions. Defendants contend that the claims are invalid under 35 U.S.C. § 112 because the specification fails to adequately disclose structure for performing this agreed-upon function.

As explained above, the control unit, which the parties agree is a subcomponent of the generation unit, alternates the amount of cyclic delay that the baseband unit applies to beacons and controls inserting information into beacons to permit or prohibit smoothing, depending on whether a first or second amount of delay is applied. JA Ex. I, 8:33-9:13, 10:35-44, Fig. 7; JA Ex. AA ¶¶ 49, 52. The specification explains that the control unit "can be realized by a CPU, a memory and other LSIs of an arbitrary computer" running "memory-loaded programs which have communication functions and the like." JA Ex. I, 9:14-19; JA Ex. AA ¶¶ 50-51. The structure corresponding to a generic processor, such as the described control unit, is not the processor alone, but includes the algorithm, if any, that the processor uses to perform the claimed function. *Aristocrat Techs. Austl. Pty. Ltd. v. Int'l. Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).

The specification does not identify any algorithm to be used by the control unit to perform the function. JA Ex. AA ¶¶ 46, 53-55. It does not disclose if or how a threshold or predetermined time amount influences whether to permit or prohibit smoothing. *Id.* Besides the

claims, the specification never even mentions a "threshold" and it only mentions a "predetermined time amount" in the summary of the invention when describing the function of adding a "predetermined time-shift amount" to a signal. Nowhere does the specification describe an algorithm in which the threshold or predetermined time amount is used to set the smoothing "information." *Id*. Indeed, Plaintiffs' own brief fails to allege that the control unit or baseband unit uses a threshold or predetermined time amount to determine whether to permit or prohibit smoothing. *See* Joint Br. 69-72. The specification therefore fails to describe sufficient structure to perform the second claimed function.

ii. Plaintiffs' structure does not perform a claimed function

If the Court disagrees with Defendants and concludes that the specification does disclose sufficient structure for performing the claimed functions, it should adopt Defendants' alternative corresponding structure because that structure is more consistent with the claims and specification, than Plaintiffs' proposed structure. Plaintiffs seem to assume the specification describes structure for comparing cyclic delay to a threshold (it does not) and appear to argue that the baseband unit is a general-purpose processor (not a function block, as the specification teaches) that, combined with the control unit, generates the claimed packet format when it performs the beacon generation algorithm described at 7:40-50, 8:6-15, 8:33-9:13, 10:35-44 and shown in Figure 7. At the same time, Plaintiffs propose corresponding structure that is not tied to a beacon generation algorithm. *See* Joint Br. at 69-70.

The algorithm disclosed in Figure 7 includes: (1) generating beacons by receiving the packets in the format described in Figure 3B and extending them to form multiple streams (JA Ex. I, 7:40-50); (2) applying one of two alternative amounts of cyclic delay to the beacons, as shown in Figure 7 (*id.*, 8:6-15, 8:33-47, 8:55-60, 10:35-44, Fig. 7); and (3) setting the smoothing control information according to the amount of delay (*id.*, 8:61-9:13; *see also* JA Ex. AA ¶ 59).

As explained above, determining whether the amount of delay is less or greater than a threshold is not disclosed in the specification. JA Ex. AA ¶¶ 46, 53-55, 59. For the sake of argument, however, if the Court does not find the claims indefinite, that disclosure must be implicit somehow in the algorithm relating to Figure 7.

The algorithm disclosed in the specification is consistent with Defendants' alternative structure, not Plaintiffs'. First, Defendants' alternative structure applies to the beacon generation process discussed in the specification. *Id.* ¶ 61. Plaintiffs' structure, on the other hand, applies to any timing operation performed on any packet type. *Id.* ¶ 64. Second, Defendants' alternative structure refers to the undisclosed but assumed step of the algorithm for determining whether to permit or prohibit smoothing based on a comparison to a threshold (*e.g.*, by determining whether a beacon was generated using a delay amount that was less than or greater than the threshold), as required by an agreed-upon function. *Id.* ¶ 60. Plaintiffs' proposed structure ignores this function and just inserts information that might have been generated using any process. *Id.* ¶ 63.

Plaintiffs fault Defendants' proposed structure for excluding the functions of generating beacons and inserting smoothing information. Joint Br. at 70. But both of those operations are implicit in Defendants' structure, which refers to a beacon with the claimed frame format and setting the smoothing information in that packet based on a threshold comparison. To erase any doubt, Defendants propose to add to their structure a reference to the portions of the specification describing the beacon generation algorithm, *i.e.*, "as set forth in figures 3A, 3C, 4, 6, and 7 and described at 7:40-50, 8:6-15, 8:33-9:13, and 10:35-44."

Defendants therefore request that the Court find the generation unit indefinite because the specification lacks sufficient corresponding structure. Alternatively, Defendants ask the Court to adopt Defendants' proposed corresponding structure, which appropriately limits the scope of the

claimed invention to the algorithm described at JA Ex. I, 7:40-50, 8:6-15, 8:33-9:13, and 10:35-44, and in Figures 3A, 3C, 4, 6, and 7.

**c. Sisvel's Reply Position**

The parties agree as to substantial portions of the function and structure of a "generation unit." There remain only two areas of disagreement between the parties:

i. whether the largely overlapping proposals disclose structure for performing the function of "including in the packet signal information permitting smoothing if an amount of CDD is less than a [threshold value defined for time/predetermined time amount] and including in the packet signal information prohibiting smoothing if the amount of CDD is greater than or equal to the [threshold value defined for time/predetermined time amount];" and

ii. whether Plaintiffs' alternative proposed structure, which entirely subsumes Defendants' proposed structure, is appropriate.

Defendants' attempted indefiniteness argument is undermined by their own brief and the declaration and deposition testimony of their expert, Dr. Winters. Defendants acknowledge that the control unit in the '377 patent specification controls both the amount of delay applied by the baseband unit and "the information that is inserted in the beacon to permit a receiver to perform smoothing of packets that include the first delay and prohibit a receiver from performing smoothing of packets that include the first delay and prohibit a receiver from performing smoothing of packets that include the second delay." (Joint Br. at 72.)

Dr. Winters also testified that the control unit discloses sufficient structure for setting information about permitting or prohibiting smoothing. (JA Ex. AA, Winters Decl. at ¶ 49; JA Ex. BB, Winters Dep. Tr. at 31:25-32:5.) Dr. Winters further testified that the algorithm applied by the control unit related to permitting or prohibiting smoothing is described in 8:33-9:13 of the specification. (*See*, JA Ex. BB, Winters Dep. Tr. at 34:15-25.)

Dr. Winters also acknowledged that a POSITA would understand not only that the ’377 specification disclosed low and high values of CDD, but would also be able to implement using a general-purpose computer *any* value of CDD, including low and high “ranges” of values. (*See* JA Ex. BB, Winters Dep. Tr. at 42:22-43:10, 44:15-22, 45:20-46:3.)

Indeed, Dr. Winters acknowledged that a POSITA would understand how to implement a threshold using code, specifically, how to implement a computer algorithm to perform a function if a certain value is greater than the threshold and not perform the function if the value is less than the threshold. (*See* Ex BB, Winters Dep. Tr. at 30:10-31:1.)

Dr. Winters thus acknowledged that a POSITA would understand how to implement the algorithm implemented by the control unit for performing the claimed function of including in the packet signal information permitting smoothing if an amount of CDD is less than a [threshold] and including in the packet signal information prohibiting smoothing if the amount of CDD is greater than or equal to the [threshold].” This is unsurprising, as Dr. Winters opined that a POSITA would have been extremely qualified, with “at least a Master’s degree in Electrical Engineering, at least 2-4 years of industry or research experience in the area of wireless communications, and familiarity with the family of IEEE 802.11 standards.” (JA Ex. AA at ¶ 15.) Accordingly, a POSITA would understand “generation unit” to have a sufficiently definite structure and the term is not indefinite. *See Triplay, Inc. v. Whatsapp, Inc.*, No. 13-1703-LPS-CJB, 2016 U.S. Dist. LEXIS 157680, at *8 n.3 (D. Del. Nov. 15, 2016) (“It is not necessary to explicate every minor implementation detail or provide source code in order for terms to be adequately described . . . It is enough that algorithms associated with the block terms are described in definite terms . . . and could be implemented by a person of ordinary skill in the art.”)

Further, Plaintiffs' proposed structure encompasses the entirety of Defendants' proposal, so all of the structure captured by Defendants' proposal is captured by Plaintiffs'. Defendants argue, without any actual evidence, that Plaintiffs' structure is too broad because it "applies to any timing operation performed on any packet type" and "just inserts information [on whether to permit or prohibit smoothing] that might have been generated using any process." (Joint Br. at 74.) But Plaintiffs' proposed structure only includes further citations to the specification so that it properly encompasses the entirety of the generation process for a "*packet signal*" as required by the claims. (*See* JA Ex. I at claim 1.)

Defendants' proposed structure should, thus, be rejected and Plaintiffs' structure adopted.

**d. Defendants' Sur-Reply Position**

Plaintiffs concede that the "generation unit" is a means-plus-function limitation, and that it must perform three functions. One function is "include[ing] in the packet signal information permitting smoothing if an amount of CDD is less than a [threshold value defined for time/predetermined time amount] and include[ing] in the packet signal information prohibiting smoothing if the amount of CDD is greater than or equal to the [threshold value defined for time/predetermined time amount]." Joint Br. at 73. Yet, Plaintiffs fail to identify any part of the specification that discloses structure for performing that function. That is because the specification lacks any such disclosure. To paper over the resulting indefiniteness, Plaintiffs make two legally-irrelevant arguments that ignore the *quid pro quo* for functional claiming under 35 U.S.C. § 112 ¶ 6.

First, Plaintiffs suggest that the specification's general-purpose computer ("control unit") is sufficient corresponding structure because it controls information regarding smoothing in some unspecified fashion. Joint Br. at 76. A general-purpose computer, however, is not itself corresponding structure, because disclosure of such a computer that "can be programmed to

perform very different tasks in very different ways . . . does not limit the scope of the claim to 'the corresponding structure, material, or acts' that perform the function, as required by section 112 paragraph 6." *Aristocrat Techs. Australia Pty. Ltd. v. Int'l. Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008). There must be an algorithm disclosed for the general-purpose computer to accomplish the claimed function. *Id.* Here, the '377 patent's specification simply does not disclose an algorithm for setting smoothing information based on a threshold or predetermined time amount of cyclic delay.

Second, Plaintiffs argue that the lack of disclosure is excused because a skilled person would have been able to implement an algorithm to perform the claimed function. Joint Br. at 76-77. But whether a skilled artisan could have implemented the omitted disclosure is "not the correct inquiry" under 35 U.S.C. § 112 ¶ 6 because the specification itself must describe the corresponding structure. *Medical Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1212 (Fed. Cir. 2003). Indeed, "[f]ulfillment of the § 112, ¶ 6 trade-off cannot be satisfied when there is a total omission of structure"; and thus, "[i]t is not proper to look to the knowledge of one skilled in the art apart from and unconnected to the disclosure of the patent." *Id.*; *see also Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1317 (Fed. Cir. 2012) ("the disclosure must identify the method for performing the function, whether or not a skilled artisan might otherwise be able to glean such a method from other sources or from his own understanding"). Even the district court opinion Plaintiffs cite required that the corresponding algorithm be "described in definite terms" in the specification. Joint Br. at 77. Under the governing legal principles, Plaintiffs' argument about what a skilled person might be able to implement is simply irrelevant. The corresponding structure inquiry hinges on the specification's disclosure, and the '377 specification does not provide any algorithm linked to the claimed function.

To the extent the Court disagrees that "generation unit" is indefinite for lack of corresponding structure, Defendants' alternative structure is preferable to Plaintiffs'. Defendants' alternative proposal is the only one that accounts for the fact that the sole algorithm described in the specification for the baseband processing unit and control unit is the algorithm for generating alternating long- and short-CDD beacons. Plaintiffs argue that their structure "encompasses the entirety of Defendants' [alternative] proposal." Joint Br. at 78. That argument is wrong for at least two reasons. To begin, Defendants' alternative proposal expressly requires structure (an algorithmic step) for an agreed-upon function (comparing an amount of applied delay to a threshold and setting smoothing information accordingly), while Plaintiffs' proposed structure does not. Moreover, Defendants' alternative proposal requires the algorithm being performed to relate to "beacons having the claimed frame format," whereas Plaintiffs' proposal simply requires the generation of generic "packet signals."

**11. "threshold value defined for time" / "a/said predetermined time amount" – Claims 1 to 4 of the '377 Patent**

| Plaintiffs' proposed construction | Defendants' proposed construction |
|---|---|
| Plain and ordinary meaning | a length of time known to and used by the transmitting apparatus to determine whether smoothing is performed by a receiver |

**a. Sisvel's Opening Position**

Plaintiffs contend that this term does not require construction as its plain and ordinary meaning is well understood by a POSITA. Defendants have provided no reason why the term should be construed as anything other than its plain and ordinary meaning.

The specification teaches that in a MIMO communication between a base station and a terminal apparatus, the streams transmitted over each antenna are time-shifted to reduce interference. (JA Ex. I at 3:56-67.) The receiver can perform a so-called "smoothing" operation of the time-shifted signals to assist in more accurately recovering data. (*Id.* at 2:9-14.) Because

such smoothing tends to be most effective when the time shift amounts are within a threshold range, the base station may, for example, provide a signal indicating whether the time-shift threshold has been met that is then used by the terminal in performing the smoothing process. (*Id.* at 4:1-35.)

For instance, the specification describes that when a first, smaller shift amount is used, the control unit within the transmitter permits the receiver to perform the smoothing process. (*Id.* at 8:61-9:3.) On the other hand, when a second, larger shift amount is used, the control unit "indicates to prohibit" the receiver to perform the smoothing processing of channel coefficients. (*Id.* at 9:3-14.) This operation of the control unit is reflected in the claim limitation that

> the generation unit includes in the packet signal, information permitting a receiving apparatus to perform a smoothing process of channel coefficients across sub-carries when an amount of shift for CDD for the packet signal to be sent from the plurality of antennas becomes smaller than a threshold value defined for time, otherwise prohibiting the receiving apparatus to perform the smoothing process.

(*Id.* at Claim 1.)

The "threshold value" in the claims at issue, thus, refers to nothing more than a time value that is used as a basis for comparison. Because the phrase, as used in the claim, is well understood by a POSITA, it does not require construction.

Defendants' construction of the term improperly incorporates other limitations that are either explicitly recited by the claim—namely, "to determine whether smoothing is performed by a receiver"—or extraneous and ambiguous—namely, "known to and used by the transmitting apparatus." The claim language fully describes what a threshold value is used for, so it is improper to read in limitations into the term "threshold value defined for time" that would render the rest of the claim superfluous. *See Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005); *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed.

Cir. 2004). Similarly, because the claim language does not explicitly state that the threshold value is "known to and used by the transmitting apparatus," and it is unclear what it means for a transmitting apparatus to "know" a threshold value, it is improper to read in such extraneous language. *See Hoganas AB*, 9 F.3d at 950.

Defendants' construction should, therefore, be rejected and the plain and ordinary meaning of this term should govern.

**b. Defendants' Answering Position**

The '377 patent's asserted claims recite a transmitting apparatus that generates, among other things, information permitting or prohibiting a smoothing process, based on whether the cyclic delay applied by the transmitting apparatus is greater or less than a "threshold value defined for time" or "predetermined time amount." The '377 patent's specification provides context for this claim limitation by describing a transmitting apparatus that applies alternating amounts of long and short cyclic delay to successively-transmitted beacons. JA Ex. I, 2:38-44, 8:34-60, 10:35-44, Fig. 7. The transmitting apparatus includes information that permits receivers to perform smoothing in beacons with short cyclic delay and includes information that prohibits receivers from performing smoothing in beacons with long cyclic delay. *Id.*, 2:50-3:2, 8:61-9:13.

Defendants' construction accurately describes what the threshold limitations mean in the context of the asserted apparatus claims, and against the backdrop of the specification. Specifically, Defendants' proposal makes clear that the threshold is an amount of time set in advance that the claimed transmitting apparatus uses to compare to an amount of delay and determine whether to permit or prohibit smoothing.

While Plaintiffs argue that no construction is necessary, its understanding of the "plain and ordinary" meaning of this term is similar to Defendants' construction. Plaintiffs

acknowledge that "the threshold value in the claims" refers to "a time value that is used as a basis for comparison." Joint Br. at 81-82. Plaintiffs appear to dispute, however, that: 1) the claimed transmitting apparatus makes the comparison; and 2) the comparison forms the basis for permitting or prohibiting smoothing. That dispute highlights why a construction is warranted here, and why Plaintiffs' plain and ordinary meaning construction is inappropriate. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) (purpose of claim construction is to resolve "fundamental dispute[s] regarding the scope of a claim term").

Regarding the first disputed issue, Plaintiffs agree that the claimed generation unit (part of the claimed transmitting apparatus) performs the function of "including . . . information permitting smoothing if an amount of CDD is less than a [threshold value defined for time/predetermined time amount] and including . . . information prohibiting smoothing if the amount of CDD is greater than or equal to the [threshold value defined for time/predetermined time amount]." Joint Br. at 67-68. Similarly, regarding the second disputed issue, Plaintiffs affirmatively contend that the generation unit's corresponding structure inserts the information "based on the amount of CDD shift," *i.e.*, by comparing the amount of CDD shift to the threshold value/predetermined time. *Id*. Plaintiffs therefore have no basis to quarrel with Defendants' proposal because Plaintiffs themselves concede that the transmitting unit makes the comparison and that the results of the comparison form the basis for prohibiting or permitting smoothing.

The Court should therefore adopt Defendants' construction of the threshold limitations, which aligns with the intrinsic record, because Plaintiffs appear poised to argue that the threshold value defined for time and predetermined time amount need not be used by the transmitting apparatus to prohibit or permit smoothing, despite its concessions on those points.

**c. Sisvel's Reply Position**

Instead of trying to ascertain the meaning of "threshold value defined for time"—the proper purpose of construing this term—Defendants' instead focus on what devices or device components utilize this threshold and to what end. For example, Defendants rely on the surrounding claim language to argue that "the transmitting apparatus makes the comparison" and "the comparison forms the basis for permitting or prohibiting smoothing." (Joint Br. at 82.) But these arguments bear on the issue of how ***other*** claim elements might be infringed and not on the meaning of "threshold value defined for time." Indeed, understanding the meaning of "a threshold value defined for time" does not require knowing what the "threshold value" is ultimately compared to, what device is doing the comparing, or how smoothing is ultimately performed.

Nonetheless, Defendants argue for an ambiguous construction that subsumes and renders superfluous the surrounding claim language: "known to and used by the transmitting apparatus to determine whether smoothing is performed by a receiver." *See Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005); *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004). This construction sheds no light on the meaning of "threshold value defined for time" but instead describes, in a cumbersome manner, a device that Defendants believe ***uses the threshold*** to carry out ***other claim elements***. *See Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1324 (Fed. Cir. 2009) ("Claims are properly construed without the objective of capturing or excluding the accused device.").

The plain-English term "threshold value defined for time" does not require formal construction. Defendants' construction should, thus, be rejected and the term be interpreted to have its plain and ordinary meaning.

**d. Defendants' Sur-Reply Position**

Plaintiffs appear to criticize Defendants' construction because it accounts for the claim context in which the "threshold value defined for time" and "predetermined time amount" terms are used. Joint Br. at 84. That criticism ignores both the framework and the purpose of claim construction. Claim terms are not construed in a vacuum. *Phillips*, 415 F.3d at 1313. "[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms." *Id.* at 1314. Plaintiffs cannot reasonably fault Defendants for proposing a construction that considers the claim language as a whole.

Moreover, the purpose of claim construction is to resolve "disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). That is what Defendants seek to do with their construction, which leaves no doubt that the claims cover only transmitting apparatuses that have and use a threshold. Tellingly, Plaintiffs do not argue that construction is substantively incorrect and have already conceded that a threshold is "used as a basis for a comparison." Joint Br. at 81. That begs the question: if Plaintiffs agree that a transmitting apparatus must use the threshold in a comparison, why do they quarrel with Defendants' construction? Conversely, if Plaintiffs now disagree with Defendants' construction, the Court should resolve that dispute because it centers on a legal question of claim construction. Defendants' construction should be adopted because it is based on the claim language and the specification, while Plaintiffs' plain and ordinary meaning improperly leaves the jury to determine claim scope.

## V. U.S. PATENT NO. 8,295,400

### 1. "the signal transmitted from a given [one] antenna"/ "the signal transmitted from another antenna"; ('400 patent, Claims 1 and 2)

The parties agree that Defendants' invalidity argument is more appropriately addressed in summary judgement briefs rather than in claim construction briefs. Therefore, they agree to defer this issue until the summary judgment stage of this case.

Dated: February 5, 2019

DEVLIN LAW FIRM LLC

/s/ Timothy Devlin
Timothy Devlin (No. 4241)
tdevlin@devlinlawfirm.com
1306 N. Broom Street, 1st Floor
Wilmington, DE 19806
(302) 449-9010

*Attorneys for Plaintiffs Hera Wireless S.A. and Sisvel UK Limited*

DUANE MORRIS LLP

/s/
Richard L. Renck (I.D. No. 3893)
222 Delaware Avenue, Suite 1600
Wilmington, DE 19801
Tel: (302) 657-4900
Fax: (302) 657-4901
rlrenck@duanemorris.com

*Attorneys for Defendants ARRIS Group, Inc.; and Belkin International, Inc.*

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ Jennifer Ying
Jack B. Blumenfeld (#1014)
Jennifer Ying (#5550)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
jying@mnat.com

*Attorneys for Defendants Lenovo Holding Company, Inc. and Lenovo (United States), Inc.*

ASHBY & GEDDES

*/s/ Steven J. Balick*

Steven J. Balick (#2114)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashbygeddes.com
amayo@ashbygeddes.com

*Attorneys for Defendants NETGEAR, Inc.; and Roku, Inc.*

**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via electronic filing on February 5, 2019.

*/s/ Timothy Devlin*
Timothy Devlin